**In re ACUSHNET RIVER & NEW BEDFORD HARBOR PROCEEDINGS RE ALLEGED PCB POLLUTION.**

**Civ. A. No. 83–3882–Y.**

United States District Court, D. Massachusetts.

Nov. 6, 1987.

---

MEMORANDUM OF DECISION CON-CERNING CERTAIN PRE-TRIAL MOTIONS: SUBJECT MATTER AND PERSONAL JURISDICTION, COR-PORATE CAPACITY TO SUE AND BE SUED

YOUNG, District Judge.

On December 10, 1983, the United States and the Commonwealth of Massachusetts filed separate complaints—now partially consolidated—against the same six corporate defendants,[1] alleging that each one was liable for polychlorinated biphenyl (PCB) contamination of New Bedford Harbor and the Acushnet River. Taken together, the lawsuits seek affirmative injunctive relief, clean-up costs, response costs, a declaration of liability for future response costs, recovery for damages to natural resources pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601–9615 ("CERCLA"),[2] the River and

---

1. The original defendants in both the suit by the United States, No. 83–3882–Y, and the suit by the Commonwealth of Massachusetts, No. 83–3899–Y, were AVX, Inc., Belleville Industries, Inc., Aerovox, Inc., RTE Corporation, Cornell–Dubilier Electronics Co., and Federal Pacific Electric Company.

2. Certain statutes stand out as models of the art of legislative draftsmanship. *See e.g.,* 18 U.S.C. § 361 (Supp.1946), commended by Professor Alfred Conard in *New Ways to Write Laws,* 56 Yale L.J. 458 at 469, 478 (1947). Others, frequently those enacted in the "harried and hurried" atmosphere prevalent during the final days of a legislative session, *see Shine v. Shine,* 802 F.2d 583, 587 (1st Cir.1986) commenting on the passage of the Bankruptcy Reform Act; *see also In re Mojica,* 30 B.R. 925, 930 (Bankr.E.D.N.Y.1983) achieve a certain quirky notoriety precisely because they are so badly drafted as to be virtually incomprehensible. There is, for example, "a 'striking resemblance' between 'King Minos' Labyrinth in ancient Crete ... and the

Harbor Act, 33 U.S.C. § 407, the Federal Clean Water Act, 33 U.S.C. §§ 1251–1376, the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 et seq. ("RCRA"), and various Massachusetts statutory and common law theories of liability. The corporations have put up a spirited defense, complicated by a series of related—and now partially consolidated—actions dealing with the insurance aspects of a potentially catastrophic business loss.[3]

Management of these sprawling congeries of cases has proved challenging and the Court expresses its appreciation to all the litigants and their counsel for their vigorous yet thoughtful and well-supported advocacy. As we have worked together to ready these cases for trial, the Court has made a number of rulings from the bench which warrant written opinions explaining and supporting the Court's reasoning. Other matters which have been taken under advisement are dealt with herein. The matters addressed in this and succeeding memoranda are organized in the order in which, logically, they ought present themselves pursuant to the Federal Rules of Civil Procedure, taking the two substantive cases first and then dealing with the insur-

ance matters. It is appropriate to note that this approach imparts a deceptive sense of order and progress which—and for this the Court takes full responsibility —is largely lacking in the day to day management of cases this complex and convoluted. It is to be hoped that these written expressions of opinion will convey both the Court's reasoning on the substantive issues as well as a sufficient overview of these related cases that all parties may comprehensively assess their positions prior to the actual commencement of trial.

## I. *The Substantive or Underlying Environmental Cases*

### A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

■ Included among the myriad motions filed in the course of this litigation was a motion to dismiss for lack of subject matter jurisdiction, filed by all defendants on July 2, 1984. The basis of that motion was that neither sovereign had given the defendants written notice of the CERCLA claims sixty days prior to filing suit. The defendants claimed that under § 112(a)[4] such notice was a jurisdictional prerequisite to a court

---

Immigration and Nationality Acts.'" *Saddozai v. Frank*, 86–1652–Y, slip op. at 6 n. 6 (D.Mass. June 25, 1986), *aff'd sub nom. Amanullah v. Nelson*, 811 F.2d 1 (1st Cir.1987), quoting *Lok v. INS*, 548 F.2d 37, 38 (2d Cir.1977). Prominent among this latter group is CERCLA, the statute most important to a proper resolution of these cases. "[R]ushed through a lame duck session of Congress," *Mayor and Board of Aldermen of Boonton v. Drew Chemical Corp.*, 621 F.Supp. 663, 668 (D.N.J.1985), quoting *State of Ohio ex rel Brown v. Georgeoff*, 562 F.Supp. 1300, 1310 n. 12 (N.D.Ohio, 1983), "CERCLA has acquired a well-deserved notoriety for vaguely drafted provisions and an indefinite, if not contradictory, legislative history." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1080 (1st Cir.1986), quoting *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H.1985). The First Circuit found "CERCLA's legislative history [to be] shrouded with mystery." *Id.* at 1081. Inartful draftsmanship, however, in no way relieves this Court of its responsibility to ascertain and declare the law's meaning. It just makes the job tougher and increases the chances that courts around the country will adopt differing approaches to major, national anti-pollution legislation.

3. The related and partially consolidated insurance actions are captioned *Lumbermans Mutual*

*Casualty Co. v. AVX Corp.*, 84–2043–Y; *Lumbermans Mutual Casualty Co. v. Cornell–Dubilier Co. and Federal Pacific Electric Co.*, 84–2044–Y; *Lumbermans Mutual Casualty Co. v. Belleville Industries, Inc.*, 84–2676–Y; *Fireman's Fund Ins. Co. v. Aerovox Inc.*, 85–2842–Y; and *American Motorists Ins. Co. v. Cornell–Dubilier Electronics Co., Inc.*; *American Motorists Ins. Co. v. Federal Pacific Electric Company*; and *Lumbermans Mutual Casualty Co. v. Federal Pacific Electric Company*, all of which carry the consolidated docket number 83–3882–Y.

4. 42 U.S.C. § 9612(a) provides:

All claims which may be asserted against the Fund pursuant to section 111 of this title shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 107 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor or other person or to present the claim to the Fund for payment.

action for damages under § 107, 42 U.S.C. § 9607. Judge McNaught, to whom this case originally was assigned, denied this motion on March 26, 1985. Although that denial was without opinion, the result was consistent with the view, earlier expressed by that judge that, while § 112(a) does establish a jurisdictional prerequisite to suit, "constructive notice" is sufficient to satisfy the jurisdictional requirement. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 588 F.Supp. 515, 517 (D.Mass. 1983) (hereinafter "Dedham Water I").

Later in 1985, the First Circuit decided *Garcia v. Cecos International, Inc.*, 761 F.2d 76 (1st Cir.1985). That decision involved the citizen suit provision of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6987. The plaintiff there had filed suit without first giving sixty days formal notice to the proper parties, as then was required by a provision of RCRA, 42 U.S.C. § 6972(b).[5] The *Garcia* court refused to follow the "pragmatic" approach to notice requirements taken by other courts in the context of similar environmental legislation. *See e.g., Pymatuning Water Shed Citizens v. Eaton*, 644 F.2d 995 (3d Cir.1981). Instead, the First Circuit interpreted RCRA as requiring a citizen to wait sixty days after "actual notice" before commencing suit. *Garcia v. Cecos International, Inc., supra* at 80.

The actual notice requirement of *Garcia* conflicts with the notion of constructive notice espoused by Judge McNaught in *Dedham Water I* and, in the wake of *Garcia*, Judge McNaught reversed his earlier decision and dismissed the Dedham Water Company case for lack of subject matter

jurisdiction. In dismissing the case Judge McNaught held that the notice requirement of § 112(a) is a jurisdictional prerequisite that must be strictly satisfied before bringing suit. *Dedham Water Co. v. Cumberland Farms, Inc.*, 643 F.Supp. 667, 669 (D.Mass.1986) (hereinafter *Dedham Water II*). In light of these two decisions the defendant Aerovox, Incorporated ("Aerovox") moved this Court to reconsider the earlier denial of the motion to dismiss. This Court ruled that it was in the best interests of justice to reconsider Aerovox's motion to dismiss, but after reconsideration again denied the motion to dismiss for lack of subject matter jurisdiction.[6] This Court's reasoning on the matter has become of little moment, however, since the First Circuit in *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074 (1st Cir.1986) reversed *Dedham Water II* and definitively held in this Circuit that pre-suit notice as provided in 42 U.S.C. § 9612 is not required in a CERCLA action of the sort before this Court since it does not involve a "claim which may be asserted against the Fund," and that the 1984 amendment to RCRA, 42 U.S.C. § 6972, applies retroactively to vest this Court with subject matter jurisdiction over the RCRA aspect of the claims. That decision disposes of these issues in this case, convincing this Court that the motion to dismiss for lack of subject matter jurisdiction was properly denied.

### B. *The Motion of RTE Corporation to Dismiss for Lack of Personal Jurisdiction*

This motion to dismiss for lack of personal jurisdiction is rather untypical. What

---

5. In 1984, RCRA's citizen suit provision was amended so as to eliminate the 60-day notice provision for all claims involving hazardous waste management. 42 U.S.C. § 6972(b)(1)(A). *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1082 (1st Cir.1986).

6. Were I writing on a clean slate I might have thought myself bound to apply Judge McNaught's *Dedham Water II* reasoning without analysis on my own part. After all, fairness to litigants demands that the justice one gets in this Court should not depend on which judge draws the case. This principle is particularly applicable in this case where it is clear, because Judge McNaught has spoken on the issue, that

had the case not been redrawn the governmental plaintiffs would now be appealing a dismissal. But such is not the rule in this Circuit. *Palandjian v. Pahlavi*, 782 F.2d 313, 314 (1st Cir.1986), makes clear that a judge, while he is certainly open to be persuaded by the views of his colleagues, ought not in any way feel bound or constrained by views which the judge considers in error. With utmost respect, I disagreed with Judge McNaught's conclusion in *Dedham Water II*. The matter was sufficiently close, however, that trial was continued in this case pending the outcome of the appeal in *Dedham Water II.*

makes this case different is that the governmental plaintiffs concede that RTE Corporation ("RTE") itself has none of the minimum contacts with the forum state traditionally thought necessary to justify the exercise of jurisdiction over an out of state defendant. Instead, the United States and the Commonwealth oppose the motion on two grounds. First, they argue that CERCLA's § 106, 42 U.S.C. § 9606, implicitly authorizes nationwide service of process, and that therefore service on RTE in Wisconsin established this Court's jurisdiction. In the alternative, the sovereigns argue that this Court should "pierce the corporate veil" of Aerovox, and treat Aerovox, which all agree is subject to this Court's jurisdiction, as RTE's alter ego. The Court will address these arguments in turn.

### 1. The Issue of Nationwide Service of Process

■ It is elemental that in enacting a statute Congress has the power to provide for nationwide service of process if it so chooses. *See Robertson v. Railroad Labor Board,* 268 U.S. 619, 622, 624, 45 S.Ct. 621, 622–23, 623, 69 L.Ed. 1119 (1925); 4 Wright & Miller, *Federal Practice and Procedure* §§ 1118 and 1125. That Congress has not expressly provided for nationwide service under CERCLA does not end the inquiry. In addition, the Court must ask whether Congress impliedly intended that "the process of every District Court shall run into every part of the United States." *Robertson v. Labor Board, supra* at 622, 45 S.Ct. at 622; *First National Bank of Canton, Pennsylvania v. Williams,* 252 U.S. 504, 509–10, 40 S.Ct. 372, 373, 64 L.Ed. 690 (1920). Where Congress has authorized service of process outside the territorial limits of the forum state, either expressly or impliedly, exercise of jurisdiction over the defendant will comport with due process so long as that defendant has "minimum contacts" with the United States as a whole. *Amtrol, Inc. v. Vent–Rite Valve Corp.,* 646 F.Supp. 1168, 1172 (D.Mass.1986), *citing Driver v. Helms,* 577 F.2d 147, 156 (1st Cir.1978), *rev'd on other grounds sub nom. Stafford*

*v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980). Here, the sovereigns argue that CERCLA impliedly authorizes nationwide service of process, and that therefore this Court may properly exercise jurisdiction over RTE, which concededly has minimum contacts with the United States.

The argument that CERCLA impliedly authorizes nationwide service of process is rooted in the rationale of *United States v. Congress Construction Co.,* 222 U.S. 199, 32 S.Ct. 44, 56 L.Ed. 163 (1911). In that case the United States brought an action under the Materialmen Act of 1894 against the principal and sureties on a payment bond. The action was brought in the district in which the defendants resided, which was different from the district in which the underlying construction was to be performed. The Circuit Court allowed a motion to dismiss for what we would now call improper venue. The Supreme Court affirmed. The Court noted that the statute expressly required that actions brought in the name of the United States be brought "in the Circuit Court of the United States in the district in which said contract was to be performed, and not elsewhere." *Id.* at 203, 32 S.Ct. at 46 (emphasis in original). In arguing for an interpretation allowing suits to be brought directly by the United States in the district in which a defendant resided, the government assumed that it often would be impossible to acquire jurisdiction over defendants in the district in which a contract was to be performed. The Supreme Court rejected this argument, saying that the:

> supposition is a mistaken one, for the provision restricting the place of suit operates *pro tanto* to displace the provision upon that subject in the General Jurisdiction Act ... and amply authorizes the Circuit Court in the district wherein the action is required to be brought to obtain jurisdiction over the persons of the defendants through the service upon them of its process in whatever district they may be found.

*Id.* at 203–04, 32 S.Ct. at 46. The above-quoted language, although technically *dicta* because the issue of personal jurisdic-

tion was not before the Court, is generally recognized as the proposition for which the case stands. *Cf. Robertson v. Railway Labor Board, supra* 268 U.S. at 625 n. 5, 45 S.Ct. at 624 n. 5. Thus, *Congress Construction Co.* and the cases that follow it counsel that a court may imply a Congressional intent to authorize nationwide service of process where the statute in question puts venue in only one district. *Robertson v. Railway Labor Board, supra* at 625, 45 S.Ct. at 624; *Federal Trade Commission v. Browning*, 435 F.2d 96, 99 (D.C. Cir.1970); *Violet v. Picillo*, 613 F.Supp. 1563, 1570 (D.R.I.1985). The logic behind this rule is that it would be anamolous to assume that in restricting venue to one district Congress intended to remove from the statute's coverage all defendants but those who happen to have the necessary minimum contacts with that district. *Violet v. Picillo, supra* at 1570.

■ In this case the sovereigns point to § 106 of CERCLA, 42 U.S.C. § 9606, as the source from which nationwide service should be implied.[7] Section 106 permits the United States to seek injunctive relief in appropriate cases. Specifically, the section provides:

> In addition to any other action taken by a state or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an *actual or threatened* release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

7. To the extent that the sovereigns also argue that nationwide authorization is implicit in § 107 or § 113, 42 U.S.C. §§ 9607, 9613, this Court adopts Judge Pettine's thoughtful and well-reasoned analysis in *Violet v. Picillo, supra* at 1570–73, in rejecting these arguments.

8. Section 113 of CERCLA, 42 U.S.C. § 9613, which is entitled "Litigation, Jurisdiction and

42 U.S.C. § 9606(a) (emphasis added). The sovereigns argue that this language puts exclusive jurisdiction for actions brought under § 106 in the district court in "the district in which the threat occurs." RTE disagrees, arguing that the grant of venue found in § 106 does not override, but instead supplements, the general venue provisions of § 113.[8] The proper interpretation is, of course, crucial. If the government's *Congress Construction* argument is to have any merit at all, the statute must limit venue for certain types of actions to only one judicial district.

*United States v. Bliss*, 108 F.R.D. 127, 23 ERC 1638 (E.D.Mo.1985), is the only case in which a court has found an implied authorization of nationwide service of process under § 106. The *Bliss* court agreed with the interpretation presented by the government here. It interpreted the statute as authorizing "no other court to dispose of abatement actions" than the district court of the district in which the threat occurs. *Id.* 108 F.R.D. 127, 23 ERC at 1645–46. The court thought that reading § 113(b) as an additional grant of venue "renders the specific jurisdictional grant of section 106 superfluous." *Id.* 108 F.R.D. 127, 23 ERC at 1646.

■ With all appropriate respect, this Court finds the reasoning of *Bliss* flawed, and declines to adopt its holding. To begin with, there is nothing "superfluous" about interpreting § 106 as an additional grant of venue. Section 113 does not put venue in the place where a "threat" occurs. Admittedly, one would expect that in most situations a threat will occur in the same place as either the release or the damage. But that does not mean that, at least in the abstract, the idea of a threat occurring in a district other than one specified in § 113(b) is irrational. Particularly in light of the

Venue," provides that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this act.... [And that] venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office." 42 U.S.C. § 9613(b).

fact that the statute imposes liability on "generators" who have contracted with others to dispose of hazardous substances, one should not presume too small a world of possible relationships between different defendants and different venues.

Moreover, the statute reads more consistently if § 106 is read as words of addition, not limitation. Section 106 authorizes injunctive relief whenever "actual or threatened" releases pose an imminent danger to the public health. Since § 113(b) already provides venue where a release actually occurs, it makes sense that in § 106 Congress would provide only the additional venue of where the threat occurs. In this way there is complete overlap between the dangers sought to be avoided and the districts in which the courts may order the danger abated. If, on the other hand, one reads § 106 as creating exclusive venue, then one must impute to Congress an intent to authorize injunctive relief in two types of cases, but to ensure proper venue in only one.

■ Finally, to the extent that the statute is unclear as to venue, it should be interpreted to give full effect to § 113(b). That is the section where it is clear that Congress addressed itself to questions of venue under CERCLA. The section suggests no exception to its coverage of "all controversies arising under this Act." Thus, this Court rules that proper venue for § 106 actions is not limited to the place in which the threat occurs. Accordingly, the Court also rules that § 106 of CERCLA does not implicitly authorize nationwide service of process.[9] If jurisdiction over RTE is to be found in this case, it is through the more traditional route of the state long arm statute.

## 2. *Pierce the Corporate Veil?*

The United States next argues that this Court should pierce the corporate veil of Aerovox in order to assert jurisdiction over RTE. The obvious question that must first be settled is against what standard should the corporate separateness of RTE and Aerovox be tested. The Government argues that whether to disregard corporate separateness in CERCLA actions is a question of federal law, and can only be decided by application of a uniform federal rule of decision. RTE argues that since the veil piercing inquiry is being made at the jurisdictional stage, and that the state long arm statute is the purported course of jurisdictional authorization, state law controls. RTE's argument misapprehends the nature of the inquiry.

■ It is true that, absent a federal statute, this Court must look to the Massachusetts long arm statute for authorization to serve process on out of state defendants. Fed.R.Civ.P. 4(e)–(f). But that statute only addresses the sufficiency of the out of state service and the amenability of the defendant to suit, *assuming* its out of state existence. RTE confuses the inquiry into whether an out of state defendant is amenable to suit with the question whether the subsidiary should be deemed an in-state agent of the defendant for certain purposes. The latter inquiry is the stuff of corporate veil piercing, and when the underlying claim is made by the United States under a federal statute the determination of that inquiry is governed by federal law. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed. 2d 711 (1979). RTE misses the mark when it argues that under Rule 4(e) a federal court may exercise jurisdiction only over those parties who could be reached by the state court. This argument wrongly assumes that were a Massachusetts court to have subject matter jurisdiction over such actions, it would be free to apply state piercing law to a CERCLA claim by the United States. The Court finds no authori-

---

**9.** Given the disposition of this issue the Court has no occasion to consider the interesting questions—which would necessarily arise were the sovereigns' argument to be accepted—of pendent party jurisdiction over the action of the Commonwealth (which cannot bring a § 106 claim of its own), and pendent claim jurisdic-

tion over the United States' remaining federal claims. *Cf. Amtrol, Inc. v. Vent–Rite Valve Corp., supra* at 1175 (allowing pendent *personal* jurisdiction over additional state claims when jurisdiction over federal claim based on nationwide service of process.)

ty which limits to federal courts the rule that federal law governs the rights of the United States under nationwide programs. Thus, the Court holds that the decision whether to disregard corporate separateness for purposes of claims made under CERCLA is controlled by federal law. Cf. Texas Industries v. Radcliff Materials, Inc., *451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981);* United States v. Chem–Dyne Corp., *572 F.Supp. 802, 808 (S.D.Ohio 1983).*

Having determined that federal law governs, the question remains whether state law or a federally created uniform law provides the rule of decision. It appears to the Court to be true beyond peradventure that consideration of the appropriate factors counsels the development of a uniform rule in these types of cases. *See United States v. Kimbell Foods, Inc., supra* 440 U.S. at 728–29, 99 S.Ct. at 1458–59.[10] In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. Congress did not intend that the ability of the executive to fund the clean up of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general, or CERCLA in particular. The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside. *Cf. United States v. Chem–Dyne Corp., supra* at 809; *State of Colorado v. Asarco, Inc.,* 608 F.Supp. 1484, 1489–90 (D.Colo.1985) (both cases concluding that uniform federal common law is necessary to address joint and several liability under CERCLA). Finally, the Court need not worry that a uniform federal rule would frustrate commercial relationships properly predicated on state law. The is-

sue here involves the rights of third parties external to the corporation. Shareholders generally are entitled to rely on the law of the incorporating state solely with regards to the internal affairs of the corporation. *Cf. First National City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) (discussing conflicts of laws issue). Therefore, the Court agrees with the sovereigns that the courts must develop a uniform federal common law for determining under what circumstances the corporate separateness of a CERCLA defendant and its shareholders should be disregarded.

It is at the point that one begins to give content to this uniform rule that the Court and the sovereigns part company. The sovereigns argue that under CERCLA there must be an extraordinarily low threshold above which equity will disregard a subsidiary's corporate separateness. The argument goes as follows. There are innumerable degrees of integration between corporations and their shareholders. Viewing these varying degrees of integration as a continuum, then the point at which the court will pierce the veil depends on the nature of the claim asserted. In other words, say the sovereigns, if the plaintiff is a contract creditor courts do not concern themselves over much with the mechanics of corporate separateness and something close to actual fraud on the part of the parent in working through the subsidiary to deal with the creditor will be required before the veil will be pierced. In the average tort case the courts ought be somewhat more demanding of separateness and the veil will be pierced if the parent and subsidiary fail to maintain an appropriate degree of independent identity. In the sovereigns' view the purposes behind CERCLA are so important that the most punctilious and complete corporate separateness must be observed and the point of piercing occurs just as soon as the parent's

10. *Kimbell Foods* set forth at least three considerations relevant to the question whether state or federal law ought supply the rule of decision: (1) whether the federal program by its nature must be uniform, (2) whether application of state law would frustrate special objectives of the federal program, and (3) the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Id.* at 728–29, 99 S.Ct. at 1458–59.

contact with the subsidiary transcends a "pure investment relationship." Thus, in a case like this where RTE owns 100% of Aerovox's stock and demonstrates a "significant degree of involvement" in Aerovox's affairs, RTE must stand ready to answer for all of Aerovox's liability under CERCLA.

■ The sovereigns' position is without support in policy or precedent.[11] Although the United States sometimes refers to RTE's "control" of Aerovox in trying to expand on what it means by "significant degree of involvement," it appears clear from the briefs and oral argument that very little more than electing the subsidiary's board of directors would be required under the sovereigns' theory to impose liability on a parent corporation. In talking about a "pure investment relationship" the sovereigns seem to mean that to limit liability the relationship between parent and subsidiary must be not unlike that of the average General Motors shareholder to his corporation. Such an expansion of liability is unfounded in either federal or state law. Even the sovereigns' own expert admits that much of the RTE–Aerovox relationship is "not unusual." Indeed, it is difficult to see how the proposed rule would further the important goals which the sovereigns contend demand such a strict standard. Under traditional principles, a corporation which wants to put a waste site or past generation site to productive use can do so by creating a well capitalized, nonfraudulent, separate corporate subsidiary. The ability to work through the subsidiary justifies the initial investment, which will delimit the extent of the risk. Under the sovereigns' proposed rule, a corporation which wanted to reclaim and make productive a waste site could not do so without risking all its corporate assets if it appeared to be more than passively interested

in the performance of its subsidiary. Patently, the sovereigns' rule would discourage investors, and reduce the number of solvent parties from which the sovereign will be able to seek clean up costs and damages.

Even assuming that the sovereigns are correct that in practice courts actually do approach the piercing question differently depending on whether the plaintiff is a creditor or tort victim,[12] that does not justify the further leap along the continuum, advocated by the sovereigns here, that under an "important" statute such as CERCLA a corporate shareholder must be practically a pure investor to avoid liability on an agency theory.[13] No matter how important the policies underlying CERCLA, it still remains true that "limited liability is the rule, not the exception." *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 537–38, 88 L.Ed. 793 (1944). Certainly the rule is not etched in stone, and may in appropriate circumstances be disregarded in order to achieve an equitable result. But that does not mean that a court should summarily disregard the corporate fiction under the guise of furthering some unspoken congressional intent. If a change so fundamental as to impose CERCLA liability on parent corporations for no reason other than the fact that they did not ignore the performance of their subsidiary is to come at all, it must come from the Congress, not the courts. What the sovereigns request here is not the development of federal common law, but an amendment to the statute. *Cf. Marshall & Ilsley Corp. v. Heimann*, 652 F.2d 685, 701 n. 27 (7th Cir.1981) *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982) (court should not, "by disregarding the corporate forms, abolish the distinctions that Congress created").

11. The Court is aware of only two cases that address veil piercing under CERCLA. *United States v. Bliss, supra; Wehner v. Syntex Agribusiness, Inc.*, 616 F.Supp. 27, 22 ERC 1732, 1733 (E.D.Mo.1985). Both courts applied traditional veil piercing principles in refusing to disregard the corporate form.

12. The proposition is at least debatable. *See e.g., Luckenbach S.S. Co. v. W.R. Grace & Co.*, 267 F. 676, 681 (4th Cir.1920); *De Witt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir.1976).

13. One might ask which legislation should be categorized as "unimportant."

■ There are a sufficient number of federal decisions dealing with shareholder liability that one can decipher a "sort of generalized federal substantive law on disregard of corporate entity." *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir.1979). Not surprisingly, this federal common law draws upon state law for guidance, *id.* at 1111, and for that reason the choice between state and federal law may in many cases present questions of academic interest, but little practical significance. The federal common law in this area emerges from the general principle that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981); *accord Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939) (separateness not recognized "when to do so would work fraud or injustice"). Standing alone, this easily stated principle gives little guidance as to the proper result in a given case. For that reason courts have articulated more specifically the variety of factors which, when viewed together, sharpen the focus of the inquiry. These factors include, in approximate descending order of importance, (1) inadequate capitalization in light of the purposes for which the corporation was organized, (2) extensive or pervasive control by the shareholder or shareholders, (3) intermingling of the corporation's properties or accounts with those of its owner, (4) failure to observe corporate formalities and separateness, (5) siphoning of funds from the corporation, (6) absence of corporate records, and (7) nonfunctioning officers or directors. *Anderson v. Abbott, supra* 321 U.S. at 362, 64 S.Ct. at 537–38; *First National City Bank v. Banco Para El Comercio, supra* 462 U.S. at 628–30, 103 S.Ct. at 2600–2602; *De Witt Truck Brothers v. W. Ray Flemming Fruit Co., supra* at 685–87 (citing cases); *Seymour v. Hull & Moreland Engineering, supra* at 1109–1111; *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618–20, 233 N.E.2d 748 (1968) (Cutter, J.) (citing cases); H. Henn & J. Alexander, *Laws of Corporations* § 148 (1983) (citing cases). No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case.

■ Likewise, although the decision whether to disregard corporate separateness cannot be answered merely by characterizing the underlying statute as "important," it is nonetheless clear that the policies embodied in a statute should direct the veil piercing inquiry. For example, in *Anderson v. Abbott, supra,* the Supreme Court held that individual shareholders in a bank holding company were liable for the unpaid portion of a statutory assessment made against shares owned by the holding company. The Court held that recovery against the shareholders of the holding company was not barred, even though the holding company "was organized in good faith, ... there was no fraudulent intent, that [it] was not a sham, ... [and] that the shareholders ... had no purpose of avoiding double liability." *Id.* 321 U.S. at 357, 64 S.Ct. at 535. In the Court's view the piercing equation was altered by the fact that the federal statute in question there expressly mandated individual liability for shareholders of the bank stock. The Court thought that to allow an impecunious holding company to be interposed between a national bank and the beneficial owners of its shares would defeat the statutory policy of double liability. *Id.* at 362–63, 64 S.Ct. at 537–38.

Of course in most cases the statute and the legislative history are silent as to the importance placed on the corporate form. In those situations the court views the statute's purposes in light of the generalized federal common law of disregard. The policies underlying the statute in question can direct the emphasis the court will place on the various factors examined in deciding whether to pierce the corporate veil. *See* Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law*, 95 Harv.L.Rev. 853, 865 n. 82 (1982) (citing cases). In this case, for example, the Court looks closely for suggestions of pervasive control by RTE over

**34**

Aerovox's hazardous waste disposal policies, or for an indication that RTE treats Aerovox as a mere instrumentality with regard to the hazardous waste of RTE.

The sovereigns place great emphasis on the undisputed fact that a primary purpose of RTE in forming a subsidiary to purchase the assets of Aerovox Industries was to avoid liability for previous PCB contamination. Focusing more on the general principle that corporate separateness will be ignored to prevent injustice than on the specific factors listed above, the sovereigns strenuously argue that RTE must now answer to Aerovox's CERCLA liability because RTE formed Aerovox with an eye towards limiting its own liability for environmental contamination. Indeed, the sovereigns took the position at oral argument that every 100% shareholder would be liable in "a CERCLA type situation in which the purpose and the intent of the private agreement was to deal with the CERCLA problem." The argument is rather remarkable because it converts the very purpose for which the law enables investors to incorporate into an impermissible evil. "There is nothing fraudulent or against public policy in limiting one's liability by the appropriate use of corporate insulation." *Miller v. Honda Motor Co.*, 779 F.2d 769, 773 (1st Cir.1985). Avoiding liability through the corporate form, without more, is not a wrong that equity's hand must right. In addition, there must be evidence of undercapitalization, pervasive control, fraud, or any of the other specific criteria already discussed. A rule such as the sovereigns propose here, which pierces the veil primarily because investors went in with their eyes open, would protect only those too ignorant to see the risk of a particular enterprise. This Court cannot countenance a rule which punishes reasonable investigation of the risks inherent in business opportunities.

The sovereigns argue that they have made a prima facie showing of the following facts which demonstrate that RTE does not treat Aerovox as a "pure investment." RTE employs a centralized cash management system whereby all subsidiaries and operating units, including Aerovox, deposit their cash receipts into individual lock box accounts, which accounts are then consolidated. RTE provided a loan guarantee for Aerovox which reduced the effective interest rate of the loan. When RTE loaned Aerovox money, the loans were repaid through inter-company billing instead of formal loan agreements. RTE requires Aerovox to seek prior approval for large capital expenditures. RTE caused Aerovox to change some of its accounting procedures. Aerovox submits various financial reports to RTE during the course of a year. Aerovox prepares quarterly forecasts for RTE. Aerovox's logo was changed to include the RTE initials. Aerovox and RTE use the same law firm in much litigation. And finally, RTE acquired an umbrella insurance policy which listed all its subsidiaries as insureds. All of this certainly shows that RTE views Aerovox as more than a pure investment. It does not, however, show such an inordinate level of integration and control as to justify the equitable remedy of piercing the veil under CERCLA. *See United States v. Bliss, supra* 108 F.R.D. 127, 23 ERC at 1642; *Wehner v. Syntex Agribusiness Systems, supra* 616 F.Supp. 27, 22 ERC at 1734.

A centralized cash management system such as the one used by RTE, where the accounting records always reflect the indebtedness of one entity to another, is not the equivalent of intermingling funds. *Cf. United States v. Bliss, supra* 108 F.R.D. 127, 23 ERC at 1642. Although if one were "keeping score" the centralized cash management would probably warrant a check on the "pierce" side of the ledger, there must be in addition considerably more integration than is presented here to justify abandoning the corporate fiction. The quarterly and annual reports made to RTE do not represent an untoward intrusion by the owner into the corporate enterprise. The right of shareholders to remain informed is similarly recognized in many public and closely held corporations. Likewise, shareholder control of significant expenditures is not a disregard of corporate separateness. The practice of iden-

tifying a subsidiary's products with the name of the parent is a frequently used marketing strategy which, given the understandings of the marketplace, does not imply a disrespect for separateness.

Indeed, there is much in the record which leads the Court to conclude the RTE has respected the separateness of Aerovox in many important ways. There can be no suggestion that Aerovox is in any way a "shell" corporation. Aerovox's present net worth, just over $17 million, is more than five times what it was at the time the company was purchased in 1978. Under the ownership of RTE, Aerovox has remained a profitable and apparently well run operation. RTE has never voted or paid itself a dividend out of Aerovox's earnings. In addition, Aerovox negotiates its own contracts, develops its own customers, arranges its own loans, develops its own budgets, creates its own marketing and sales programs, hires and fires its own employees, maintains its own financial records and accounts, and regularly conducts board of directors meetings. Perhaps most importantly, nothing in the record suggests that RTE exploited Aerovox's existence to shield itself from potential CERCLA liability other than that relating to Aerovox's operations. For example, there is no evidence that Aerovox is making some component vital to a RTE product line, the manufacture of which necessarily involves generating hazardous substances. To the extent that Aerovox is integrated into or controlled by RTE, the relationship does not appear to be at a level uncommon between parent and wholly owned subsidiary. If limited liability is to remain the rule and not the exception, then this generally accepted structure ought not be torn down absent statutory authorization.

In summary, the Court rules that the present circumstances do not justify disregarding the corporate separateness of Aerovox for purposes of this environmental action. Aerovox is a viable, ongoing, independently operated company. RTE has done nothing to decrease Aerovox's ability

to satisfy any judgment that may enter in this action. Although RTE no doubt influences the philosophy and management of Aerovox, this is true of all majority shareholders, and RTE has not so extensively controlled Aerovox that Aerovox should be deemed its agent for purposes of acquiring personal jurisdiction.

For these reasons, the motion of RTE to dismiss for lack of personal jurisdiction was allowed on March 27, 1986.

### 3. *The SARA Amendments*

■ Less than five months after this Court's decision was announced from the bench, the President signed into law the Superfund Amendments and Reauthorization Act of 1986, P.L. 99–499 ("SARA"), which amends § 113 of CERCLA by adding the following new subsection which explicitly authorizes nationwide service of process as follows:

(e) Nationwide service of process—In any action by the United States under this act, process may be served in any district where the defendant is found, resides, transacts business, or has appointed an agent for the service of process.

SARA, Pub.L. No. 99–499, § 113(e), 100 Stat 1613, 1648 (1986). Based on the legislative history of this SARA amendment, the United States [14] seeks reconsideration of the Court's dismissal of RTE.

SARA's legislative history indicates clearly that the Congressional committees which considered the proposed SARA amendments in 1985 and 1986 were concerned, as the committees put it, to "clarify" that the Congress which had passed CERCLA intended to provide for nationwide service of process without explicitly saying so. To this end, the Senate Report, discussing the proposed amendment to § 113, states:

Defendants in some actions brought [challenges to] personal jurisdiction through out-of-state service because of a lack of minimum contacts. This amendment expressly confirms that the United

---

14. Since the authorization for nationwide service of process under CERCLA applies only to

"any action by the United States," it alone seeks reconsideration on this ground.

States may serve a defendant in any district where the defendant resides, transacts business, has appointed an agent for service of process, or may otherwise be found. Although service of process has been implicitly available under CERCLA, this amendment makes the availability of such service explicit, to avoid future arguments on the issue and to expedite government enforcement actions.

S.Rep. No. 11, 99 Cong., 1st Sess. 59 (1985). Similarly, the House Report states:

This section clarifies and confirms that nationwide service of process is available under CERCLA. Although service of process has been implicitly available under CERCLA, this amendment makes availability of such service explicit, to avoid future arguments on the issue and to expedite government enforcement actions.

H.R.Rep. No. 253, 99th Cong., 1st Sess. 79 (1985), U.S.Code Cong. & Admin.News 1986, pp. 2835, 2861.

The Conference Report confirms the intent of the committees of the Senate and House who had earlier considered the proposed SARA legislation.

The Conference substitute adopts the language related to nationwide service of process that was contained in the House amendment. This provision, designated new section 113(e) of CERCLA, clarifies and confirms that nationwide service of process is available for suits instituted by the United States under CERCLA.

H.R.Rep. No. 962, 99th Cong., 2d Sess. 222 (1986) (Conference Report), U.S.Code Cong. & Admin.News 1986, p. 3315.

It is, of course, a common legislative ploy to seek to "clarify" a badly drafted statute once its lacunae come to light in subsequent litigation.[15] It is likewise clear beyond peradventure that the SARA amendments operate prospectively with full force and effect.[16]

Had the SARA amendments expressly declared the intent of Congress as to the interpretation which ought be given CERCLA on the issue of nationwide service of process, such declaration would be "entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. Federal Communications Commn.*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371 (1969) (footnote omitted). This deference stems from the knowledge that, as respects the legislative enactment itself, Congress has proceeded formally through the entire legislative process with all its opportunities for hearing, comment, compromise, and reflection by all members of Congress. The Supreme Court, however, has sharply distinguished such subsequently enacted legislative declarations of Congressional intent from comments contained in a committee or conference report accompanying subsequent legislation.

With respect to subsequent *legislation,* ... Congress has proceeded formally through the legislative process. A mere statement in a conference report of such legislation as to what the committee believes an earlier statute meant is obviously less weighty. The less formal types of subsequent legislative history provide an extremely hazardous basis for inferring the meaning of a Congressional enactment.... Thus, even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.

*Consumer Products Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980) (emphasis in original).[17]

**15.** For a home grown instance of this stratagem—with which this writer is personally acquainted—see Mass.Stat. 1974, ch. 527 §§ 1, 2, 4, and 6 where the Massachusetts legislature in 1974 "clarified" its intent in passing a statute in 1961.

**16.** There is here no contention that the SARA amendments have retroactive effect.

**17.** More generally, the Supreme Court has observed that "[r]eliance on legislative history in divining the intent of Congress is ... a step to be taken cautiously," *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982), quoted in *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 625–26 (1st Cir.1987) and has emphasized that "the views of a subsequent Congress form a hazardous basis

The interpretation this Court has given § 113 as CERCLA was originally enacted is, in this Court's view, a reasonable conclusion from the language used and CERCLA's own legislative history. It is true that the First Circuit, although recognizing "that Congressional hindsight is no substitute for legislative analysis generated during the period immediately preceding the enactment of the bill, ... [found] the language of the recent Conference Report [concerning the SARA amendments] to have some force due to the aura of uncertainty that has surrounded ... [another] portion of the CERCLA scheme." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986). The United States argues that the same "aura of uncertainty" attaches to the issue of whether nationwide service of process was originally available under CERCLA. *See Violet v. Picillo,* 613 F.Supp. 1563, 1573 (D.R.I.1985) (nationwide service of process not available under § 107 of CERCLA); *Wehner v. Syntex Agribusiness, Inc.,* 616 F.Supp. 27, 28 (E.D.Mo.1985) (nationwide service of process not explicitly provided for in actions under § 107 of CERCLA); *United States v. Bliss,* 108 F.R. D. 127, 135 (E.D.Mo.1985) (nationwide service of process available under § 106 of CERCLA).

Agreeing that an "aura of uncertainty" has surrounded the issue of nationwide service of process under CERCLA as originally enacted and giving "some weight" to the views of the Congressional committees who drafted the SARA amendments, however, does not mandate a reversal of the order previously entered allowing RTE's motion

to dismiss. It may well be that many members of Congress wish that CERCLA had made clear that nationwide service of process was to be afforded the United States in the version of CERCLA originally enacted. That may indeed have been the intent of the particular members who voted for the enactment of both CERCLA and SARA. The plain fact is, however, that CERCLA as originally enacted did not explicitly provide for nationwide service of process—a step Congress certainly could have taken had it so desired—and that the arguments that it did so implicitly are, as discussed above, short of the mark both in terms of the original legislative history and the logical interpretation of the language actually used in the original enactment.

For these reasons, this Court, upon reconsideration, declines to vacate its March 27, 1986 bench ruling.[18]

C. *The Belleville Motion for Summary Judgment—Corporate Capacity to be Sued*

One final issue relating to the proper parties remained. Belleville Industries, Inc. ("Belleville") moved for summary judgment on the ground that it does not now possess the corporate capacity to be sued, i.e., that Belleville does not now exist as a legal entity. The relevant background of the present summary judgment motion may best be summarized by paraphrasing the careful determination of undisputed facts made by Mr. Justice William Carey of the Massachusetts Superior Court in considering a somewhat similar motion for summary judgment in *RTE Corporation v.*

for inferring the intent of an earlier one." *Consumer Products Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. at 117–18, 100 S.Ct. at 2060–61, quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960). According to the Supreme Court, "[i]t is the intent of the Congress that enacted [the section] ... that controls" and not the intent of a subsequent Congress. *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979), quoting *Teamsters v. United States,* 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977). The penchant of Congressional committees to declare legislative "history" for statutes earlier enacted has been denounced as "deeply anti-constitu-

tional" by Solicitor General Charles Fried in remarks to the Judicial Conference of the First Circuit, October 13, 1987.

18. This may not be the end of the matter. Theoretically, the United States, now armed with nationwide service of process, could seek to serve RTE afresh and claim that the complaint as it pertains to RTE relates back to the time of the filing of the original complaint. Fed.R.Civ. P. 15(c). Of course, such amended complaint would necessarily have to allege, in light of the discussion in the preceding section and the dictates of Fed.R.Civ.P. 11, that RTE was directly liable and not simply the parent of Aerovox.

*Belleville Industries, Inc.,* No. 13456, memorandum decision and order at 2–3, 5 (Mass. Superior Ct. June 19, 1987), a related case in the courts of the Commonwealth.

At a closing on October 27, 1978, all the assets of Belleville, then known as Aerovox Industries, Inc., were transferred to Aerovox, the wholly owned subsidiary of RTE in return for a certain number of RTE shares. As part of this transaction, Aerovox assumed certain liabilities but specifically disclaimed the assumption of any liabilities connected with PCB's, and Belleville undertook to indemnify Aerovox against certain liabilities. In light of this indemnification agreement, certain of the RTE shares with which RTE had purchased the assets of Belleville were placed in escrow. The remainder were delivered to Belleville and transferred by it to its shareholders. In December, 1978, Belleville dissolved, allegedly pursuant to Mass.Gen.Laws ch. 156B.

Due to claims of improper PCB disposal having been made against RTE and Aerovox, these corporations demanded the release to them of the RTE shares then being held in escrow. The former Belleville stockholders, also claimants to the RTE shares in escrow, disputed the validity of the claims by RTE and Aerovox.

In November, 1981, and further in December, 1981, an application for the revival of Belleville pursuant to Mass.Gen.Laws ch. 156B, § 108 was submitted by Aerovox to the Secretary of the Commonwealth, which revival was granted on or about December 18, 1981. Pursuant to § 108, Belleville was revived for the "purpose of defending or prosecuting litigation to its final conclusion." On December 16, 1981, RTE and Aerovox had commenced an action in the Massachusetts Superior Court seeking, among other relief, the return of the RTE shares held in escrow. On December 18, 1981, Mr. Justice William Mone of that court appointed Thomas F. Burke, Esq. receiver of the resuscitated Belleville pursuant to Mass.Gen.Laws ch. 156B, § 104 and extended its corporate life until further order of the Massachusetts Superior Court. As noted above, this federal action was commenced against Belleville and the other federal defendants on December 10, 1983. Belleville's motion for summary judgment raising the corporate capacity defense followed.

Belleville argues that Mass.Gen.Laws ch. 156B, § 102 creates an absolute bar to litigation against a corporation after the expiration of three years from the date of the corporation's dissolution. Under § 102, a corporation continues to exist for three years after dissolution for the purpose of winding up its affairs.[19] The sovereigns contend, however, that § 102 operates to automatically prolong a corporation's existence for a three-year period without the necessity of any special action on a creditor's part and § 108, providing for revival of a dissolved corporation,[20] and § 104, pro-

---

**19.** § 102. Continuation for purposes of litigation and settlement of affairs

Every Corporation whose corporate existence for other purposes is terminated (1) by dissolution under the provisions of section ninety-nine, one hundred, or one hundred and one, (2) by the expiration of the period for its duration limited by its articles of organization, or (3) in any other manner, shall nevertheless be continued as a body corporate for three years after the time when its existence is terminated, for the purpose of prosecuting and defending suits by or against it and of enabling it gradually to settle and close its affairs, to dispose of and convey its property and to make distributions to its stockholders of any assets remaining after the payment of its debts and obligations, but not for the purpose of continuing the business for which it was established; provided that the corporate existence of such a corporation, for the pur-

poses of any suit brought by or against it prior to the commencement of, or during, said period of three years, shall continue beyond said period for a further period of ninety days after the final judgment in the suit.

**20.** § 108. Revival of dissolved corporation for general or limited purposes; conditions; effect

If the state secretary finds that the existence of a corporation has terminated in any manner and that such corporation ought to be revived for all purposes or for any specified purpose or purposes with or without limitation of time, he may, upon application by an interested party, file in his office a certificate in such form as he may prescribe reviving such corporation. The state secretary may subject the revival of such corporation to such terms and conditions, including the payment of reasonable fees, as in his judgment the public interest may require. Upon the filing

viding for the appointment of a receiver,[21] permit a party to file a lawsuit against a dissolved corporation after the expiration of the three-year period.

■ The sovereigns first argue that insofar as the Secretary made factual findings regarding the applicability of § 108 to Belleville, the certificate reflects an administrative determination that Belleville should be revived for purposes of litigation and that Belleville's challenge to the Secretary's action is, therefore, barred by the Eleventh Amendment. This Court rules the sovereigns' Eleventh Amendment claim to be without merit. This is not an action against the Commonwealth or its Secretary, but rather a question involving the interpretation of Massachusetts law. This Court is competent to interpret state law as long as it has subject matter jurisdiction over the claim. *See Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, this issue is properly before the Court.

■ The Massachusetts courts have interpreted § 108 to permit the revival of a corporation in order to defend lawsuits brought more than three years after the corporation was dissolved. *Salvato v. Di-Silva Transportation Co.,* 329 Mass. 305, 308, 108 N.E.2d 51 (1952) (permitting revival of a corporation to defend a suit brought more than three years after the corporation was dissolved); *Kennedy v. Strand Radio Sales and Service, Inc.,* 14 Mass.App.Ct. 935, 935–36, 437 N.E.2d 241 (1982) (permitting revival of a corporation to defend a suit brought more than five years after the corporation was dissolved); *Everett Credit Union v. Allied Ambulance Services, Inc.,* 12 Mass.App.Ct. 343, 348–49, 424 N.E.2d 1142 (1981) (permitting revival of a corporation to defend a suit brought seven years after the corporation was dissolved).

Belleville distinguishes these cases on the ground that these corporations, unlike Belleville, did not cease their business operations following dissolution. It argues that § 102 does not operate as an absolute bar when the corporation continues to do business after dissolution. While § 102 provides that "[e]very corporation whose existence for other purposes is terminated," there is nothing in § 108 that suggests that a corporation must have continued to do business after its dissolution in order to be revived and there is no indication that the courts have adopted this restrictive interpretation of either section of the statute. In addition, it is unclear in *Kennedy* and *Salvato* whether the corporations did in fact, as Belleville asserts, continue to do business after dissolution. In any event, there is nothing in the opinions suggesting that this was the basis for the court's deci-

---

of a certificate reviving a corporation for all purposes, said corporation shall stand revived with the same powers, duties and obligations as if it had not been dissolved, except as otherwise provided in said certificate; and all acts and proceedings of its officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, shall, except, as aforesaid, stand ratified and confirmed. If such a corporation is revived as aforesaid for a limited time or for any specified purpose or purposes, it shall stand revived for such time or for the accomplishment of such purpose or purposes in accordance with the terms of the state secretary's certificate. For cause shown to his satisfaction, the state secretary may, by certificate filed as aforesaid, extend the time for which a corporation revived for a limited time shall stand revived. A certificate filed by the state secretary pursuant to this section shall constitute an amendment of the articles of organization of the corporation, effective when filed.

21. 104. Receivership; dissolved or terminated corporation; jurisdiction; application; powers of receiver.

If the existence of the corporation for other purposes is terminated (1) by dissolution under the provisions of section ninety-nine, one hundred, or one hundred and one, (2) by the expiration of the period for its duration limited by its articles of organization, or (3) in any other manner, the supreme judicial or superior court, upon application of a creditor or stockholder, shall have jurisdiction in equity to appoint one or more receivers to take charge of its estate and effects and to collect the debts and property due and belonging to it, with power to prosecute and defend suits in its name or otherwise, to appoint agents under them and to do all other acts which might be done by such corporation, if in being, which may be necessary for the final settlement of its unfinished business. The powers of such receivers and the existence of the corporation may be continued as long as the court finds necessary for said purposes.

sions. In *Everett Credit Union*, 12 Mass. App.Ct. at 347–48, 424 N.E.2d 1142, the court specifically mentioned that the corporation continued to do business but it did not indicate that this was relevant to its conclusion that the corporation could be revived to defend a suit brought after the expiration of the three-year period. Finally, it is not clear that the parties challenged the revival in *Everett Credit Union.*

The legislative history of the revival statute also suggests that § 102 does not impose a time limitation on § 108. The original revival statute included a three-year limitation. *Harpoot Assyrian United Ass'n v. Assyrian National Union*, 296 Mass. 224, 229, 5 N.E.2d 435 (1937). The statute was subsequently amended to increase the limitation to five years, 1938 Mass.Stat., ch. 456, and later amended to delete the limitation entirely. 1969 Mass. Stat., ch. 392. This Court concludes that § 102 does not impose a limitation upon the power of the Massachusetts Secretary of State to revive a dissolved corporation under § 108.

Belleville raises two objections to the application of § 104 to the present case.[22] First, it asserts that § 104 provides a mechanism for settling "unfinished business" and that the term "unfinished business" imports the prior existence of a relevant transaction. Belleville concludes from this interpretation that § 104 is inapplicable to actions brought three years after dissolution. The Massachusetts courts have not addressed this issue. While one can certainly draw Belleville's interpretation of the statute from the statutory language, Belleville's conclusion does not flow logically from the issues indisputably presented by this and the related state case in which it is now embroiled. Any PCB-related action, whether it was brought before or after the three-year period, would be Belleville's unfinished business in light of its agreement to indemnify Aerovox.

▮ In other jurisdictions, courts have held that similar statutory provisions

should be interpreted to allow for the appointment of a receiver to defend actions brought against dissolved corporations, after the three-year winding up period. *See e.g., Gross v. Hougland*, 712 F.2d 1034, 1040 (6th Cir.1983) (Under Delaware law, a corporation may be revived three years after dissolution by appointing a receiver, and the corporation may, after appointment of a receiver, prosecute and defend lawsuits); *Johnson v. Helicopter & Airplane Services Corp.*, 404 F.Supp. 726, 732 (D.Md.1975) (Under Delaware law, "a corporation has capacity to sue or be sued 1) during the three-year winding-up period; 2) beyond three years if an extension has been procured; or 3) if a receiver or trustee has been appointed"); *Patterson v. Missouri Valley Steel*, 229 Kan. 481, 625 P.2d 483 (1981). This Court concludes that Massachusetts will follow the same course.

▮ Belleville's second objection to the application of § 104 for the present case is that the appointment of a receiver to the *RTE v. Belleville* action is limited to that action and does not make Belleville subject to actions by the United States and the Commonwealth of Massachusetts. There is no support for this position in the statute, case law, or the order of the Massachusetts Superior Court.

▮ Belleville contends that § 108 was improperly applied in two respects. First, a revival application under § 108 must be brought by an "interested party." Belleville contends that RTE and Aerovox were not "interested parties" within the meaning of the statute. An interested party, for the purpose of § 108, has been defined broadly by the Massachusetts Supreme Judicial Court as a party "who is interested in having the corporation revived." *Russell Box Co. v. Commissioner of Corporations & Taxation*, 325 Mass. 536, 540, 91 N.E.2d 750 (1950). The court stated that this includes "a party who has a claim against the corporation." *Id.* at 540, 91 N.E.2d 750. Aerovox contends that Belleville agreed to retain all PCB-related liability and to in-

**22.** The sovereigns do not raise an Eleventh Amendment objection to Belleville's § 104 claim since Belleville does not challenge the validity of the Superior Court's order, but rather challenges the sovereigns' interpretation of the order.

demnify RTE and Aerovox for any PCB-related liability arising out of Belleville's or its predecessor's disposal of PCBs. At the time Aerovox and RTE filed to revive Belleville, the United States Environmental Protection Agency and the Department of Environmental Quality Engineering of the Commonwealth of Massachusetts had initiated investigations with respect to PCB contamination of the New Bedford Harbor and the Acushnet River. In addition, Aerovox had been named a defendant in actions filed in the United States District Court and the Massachusetts Superior Court, arising out of the use of PCBs by Belleville or its predecessors. *See Connor v. Aerovox Incorporated*, No. 80–2924–S (D.Mass); *Nunes v. Aerovox Incorporated*, Bristol No. 1145 (Mass. Superior Ct.). Aerovox had an interest in the revival of Belleville to enforce its indemnification rights with respect to these actions and to ensure that PCB-related liability would be imposed directly on Belleville when appropriate, avoiding the need for litigation in the future. Finally, Aerovox continues to have an interest in Belleville's revival in light of this Court's decision that, to the extent Belleville is unable to satisfy any judgment that may enter against it, Aerovox is liable to make up the difference as Belleville's successor.

Second, Belleville contends that the revival is void since RTE and Aerovox made misrepresentations in their application to the Secretary of the Commonwealth. This claim is without merit. Belleville's contention is based on the notion that RTE and Aerovox knew that Belleville's liabilities ceased to exist after the expiration of the three-year prolongation period and, accordingly, misrepresented the scope of their indemnification rights, creating rights that extended beyond the three-year period in order to have the right to sue at the expiration of the three years. This is not a matter of factual knowledge which might be misrepresented; rather it raises the legal issue that is at the heart of this motion. It is Aerovox's contention that, as matter of law, the expiration of the three-year prolongation period does not cut off Belleville's liability, but rather, required Aerovox to avail itself of § 108 or § 104. There is no suggestion that in advancing this legal theory or in acting upon it Aerovox was acting in bad faith. Indeed, it is the ruling of this Court that Aerovox was and is correct in its interpretation of Mass.Gen. Laws ch. 156B, §§ 102, 104, and 108.

In conclusion, Belleville was properly revived by the Secretary of the Commonwealth pursuant to § 108 and, therefore, possesses the corporate capacity to be sued. In addition, while revival was all that was necessary to bring Belleville before the Court, a receiver was properly appointed by the Massachusetts Superior Court sitting in Bristol County, pursuant to § 104, for the specific purpose of "defending suits" and "settling unfinished business." Accordingly, Belleville's motion for summary judgment on the ground that it lacked the corporate capacity to be sued was denied.[23]

23. As is evident from the discussion above, this is an issue which has been determined by reference to the laws of the Commonwealth of Massachusetts. What's more, the issue of Belleville's present capacity to sue and be sued is also being actively litigated in the Massachusetts Superior Court, *RTE Corporation v. Belleville Industries, Inc.*, No. 13456, Memorandum Decision and Order at 3–4, 9 (Mass. Superior Ct. June 19, 1987) (Carey, J.). Notwithstanding the discussion above, which is merely persuasive—if that —in the courts of the Commonwealth, resolution of this related action may have a significant impact on the prosecution of the present litigation. If it is determined by final judgment in the courts of the Commonwealth that Belleville is capable of being sued, Belleville's hope of challenging this Court's ruling on appeal would appear to be dashed by issue preclusion grounds. *Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322, 332–33, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979). Conversely, if the Superior Court determines by final judgment that Belleville no longer has a corporate existence—and no appeal is taken from that determination—this Court will necessarily have to reassess its present ruling, not on principles of issue preclusion or res

judicata—after all neither sovereign here is a
litigant in the related Superior Court action—
but because a judgment of the Massachusetts
Superior Court definitively declares the law of
the Commonwealth in the absence of contrary

Massachusetts appellate authority. *See Wood v.
General Motors Corp.,* 673 F.Supp. 1108 (D.Mass.
1987) citing *Commonwealth v. DeArmas,* 397
Mass. 167, 173, 490 N.E.2d 433 (1986) (Liacos, J.
concurring).