**JOHN BOYD CO., et al., Plaintiffs,**

v.

**BOSTON GAS COMPANY, et al., Defendants.**

Civ. A. No. 89–675–T.

United States District Court, D. Massachusetts.

July 3, 1991.

Richard Alan Johnston and Richard L. Hoffman, Hale & Dorr, Boston, Mass., for John Ryder, David Cohen, Rosalie Ryder, John Boyd Co., Inc. and Saul Gilberg.

James W. Stoll, Gerald Tishler, Brown, Rudnick, Freed & Gesmer, and Lawrence E. McCormick, Boston Gas Co., Boston, Mass., for Boston Gas Co. and Eastern Fuel and Gas Associates.

Scott P. Lewis and Douglas A. Johns, Palmer & Dodge, Boston, Mass., for Massachusetts Elec. Co. and New England Elec. Systems.

Donald L. Anglehart, Paul J. Murphy and Duncan S. Payne, Cuddy, Lynch, Manzi & Bixby, Boston, Mass., for Lynn Economic Development, Lynn Economic Development Indus. Com.

## MEMORANDUM

TAURO, District Judge.

### I

#### Introduction

The owners of several parcels of land in Lynn, Massachusetts ("Plaintiffs") allege that waste materials from a former coal gasification plant (the "Plant") have contaminated their property. Plaintiffs have alleged causes of action arising out of that contamination against five different entities that, directly or indirectly, owned either the Plant or portions of the former Plant site. According to the Second Amended Complaint, the following history of the Plant's ownership and operations provides a basis for Plaintiffs' theories of liability.

Lynn Gas & Electric ("Lynn G & E") opened the Plant in the late nineteenth century, and continued to operate it

through the 1950's. In 1957, defendant New England Electric Systems ("NEES") acquired a controlling interest in Lynn G & E and assumed ultimate responsibility for operating the Plant. In 1960, NEES and Lynn G & E transferred Lynn G & E's gas operations, including the Plant, to the Lynn Gas Company ("Lynn Gas"). A wholly-owned subsidiary of NEES then acquired more than 93% of Lynn Gas's common stock. At the same time, Lynn G & E changed its name to Lynn Electric Co. ("Lynn Electric"). Lynn Electric sold the parcel of land containing the Plant ("Lot 3") to Lynn Gas, but retained ownership of the adjacent parcels ("Lots 1, 4, and 6"). Thereafter, Lynn Electric continued its electricity operations under its new name, while Lynn Gas continued to own and to operate the Plant until 1973.

In 1962, NEES merged Lynn Electric and other NEES subsidiaries into defendant Massachusetts Electric Company ("Mass. Electric"). In 1973, NEES, defendant Eastern Enterprises ("Eastern"), and defendant Boston Gas Company ("Boston Gas") entered into a complicated transaction which resulted in Eastern's acquisition of NEES's interest in Lynn Gas, the immediate liquidation of Lynn Gas, and the transfer of all Lynn Gas's assets to Boston Gas [1] in exchange for a payment of approximately six million dollars to Eastern. Boston Gas then continued to operate the Plant for an indeterminate period of time.[2]

In 1981, after the Plant had ceased operations, defendant Lynn Economic Develop-

ment and Industrial Corporation ("EDIC")[3] took several parcels of land surrounding the Plant by eminent domain, including Lots 1, 4, and 6 from Mass. Electric and Lot 3 from Boston Gas. Later in that same year, EDIC sold Lot 3 and part of Lot 1 to plaintiff John Boyd Co., Inc. ("Boyd"), Lot 6 to plaintiffs John and Rosalie Ryder (the "Ryders"),[4] in their capacity as Trustees of Bay Marine Trust and Bay Marine Trust II, and Lot 4 to Saul Gilberg ("Gilberg"), in his capacity as Trustee of Broad Street Trust. In 1983, plaintiff David Cohen, in his capacity as Trustee of Puritan Realty Trust, purchased Lot 4 from Gilberg.

At some point in 1987, Plaintiffs discovered hazardous substances, including coal tar and coal slag, on each of their Lots. Plaintiffs subsequently initiated this lawsuit, alleging negligence, violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), violations of the Massachusetts Oil and Hazardous Material Release Prevention Act, M.G.L. c. 21E (the "Massachusetts Hazardous Waste Act") and violations of the Massachusetts Consumer Protection Statute, M.G.L. c. 93A.[5]

## II

### *Negligence*

#### A. *Pre–1960*

Defendants Boston Gas, NEES, Eastern, and Mass. Electric have all moved

---

1. In its new capacity as controlling shareholder of Lynn Gas, Eastern voted all its shares to approve both the liquidation and the asset transfer.

2. In its opposition to Plaintiffs's motion for partial summary judgment, Boston Gas asserted that "[i]t is undisputed that Boston Gas never conducted any gas operations on its present property or those purchased from EDIC by the plaintiffs." Boston Gas's Memorandum in Opposition to Motion for Summary Judgment at 44. For the purposes of this motion to dismiss, however, it is of no consequence whether Boston Gas itself in fact operated the plant, as Plaintiffs have also charged Boston Gas with responsibility for the acts of Lynn Gas under various theories of successor liability.

3. The Second Amended Complaint refers to EDIC as the Lynn Economic Development and Industrial *Commission.* Subsequent to the filing of that complaint, Plaintiffs filed a Motion to Correct Misnomer of Party which the EDIC has not formally opposed. That motion is hereby ALLOWED. In permitting this technical correction, this court expresses no opinion about any issues concerning the validity of the complaint as against the Lynn Economic Development and Industrial Corporation, including, for example, the adequacy of any service of process against it.

4. The Ryders later subdivided Lot 6 into Lots 6A and 6B.

5. Plaintiffs have also requested a declaratory judgment.

to dismiss the negligence count against them. They argue that Plaintiffs, as subsequent purchasers, cannot maintain an action for injury caused to their property by the negligence of the property's former owners, the Defendants. In general, a Massachusetts landowner owes no common law duty to subsequent owners with respect to the manner in which the land had been maintained prior to sale. *Wellesley Hills Realty Trust v. Mobil Oil Corporation*, 747 F.Supp. 93, 100 (D.Mass.1990).[6] Here, the contaminated property now consists of five separate Lots. But those Lots comprised one parcel of land, with a common owner, for the entire period of the Plant's operation until the transfer of the Plant and Lot 3 to Lynn Gas in 1960. This court, therefore, agrees with Defendants that Plaintiffs have failed to state a cause of action for negligence for any activities prior to this 1960 transfer.[7]

### B. *Post–1960*

Defendants Boston Gas and NEES are both charged with negligence for acts arising out of the Plant's operation after the transfer of Lot 3 in 1960. During this entire period, separate entities owned Lot 3 and Lots 1, 4, 6A, and 6B.[8] As current owners of Lots 1, 4, 6A, and 6B, Plaintiffs have alleged negligence claims against Boston Gas and NEES, the former owners of the adjacent parcel, Lot 3. Such claims against an adjacent landowner, as opposed to a mere prior owner, fall within the scope of a traditional negligence action, and outside of the purview of *Wellesley Hills. See Wellesley Hills*, 747 F.Supp. at 100. Boston Gas's and NEES's motions to dismiss Count VI (Negligence) of Boston Gas and NEES are, therefore, DENIED.[9]

Defendant Mass. Electric, as a prior owner of Lots 1, 4, 6A, and 6B, stands in a different position. Plaintiffs cannot main-

---

**6.** The two recognized exceptions to this general rule both impose liability for harm to persons, and not merely for a diminution in the value of the land. *Wellesley Hills*, 747 F.Supp. at 100. Plaintiffs suggest that the second of these exceptions, applicable in situations where the condition of the land poses an unreasonable risk of harm to those outside the premises, creates a general rule that subsequent property owners can recover damages from prior owners. That argument misses the point of this exception, which is to impose a continuing responsibility for personal injuries on an individual or entity responsible for creating an unreasonable risk. *See* Prosser & Keeton on Torts, § 64 at 488 (4th ed. 1984).

**7.** This court notes that courts in other jurisdictions have recently allowed property owners to assert causes of action for strict liability for abnormally dangerous activities against predecessors in title. *See, e.g., T & E Industries, Inc. v. Safety Light Corporation*, 123 N.J. 371, 587 A.2d 1249, 1255–59 (1991) (liability for radium ore tailings); *Hanlin Group v. Intl. Minerals & Chemical Corp.*, 759 F.Supp. 925, 934 (D.Me. 1990) (following *T & E Industries* in case applying Maine law). Whatever the wisdom of allowing such causes of action as a matter of policy, this court must limit its inquiry to ascertaining the rule that Massachusetts's highest tribunal would likely follow. *See Porter v. Nutter*, 913 F.2d 37, 40–41 (1st Cir.1990). In this instance, this court agrees with Judge Caffrey that, particularly in light of *Sheehy v. Lipton Industries, Inc.*, 24 Mass.App.Ct. 188, 191–92, 507 N.E.2d 781, 783–85, *further rev. denied*, 400 Mass. 1103, 509 N.E.2d 1202 (1987) (no cause of action

against prior owner for creation of private nuisance), the Massachusetts Supreme Judicial Court would not allow a negligence action against a prior landowner. *See Wellesley Hills*, 747 F.Supp. at 99–101.

**8.** Although the parties have not addressed the issue, a tension exists between Plaintiffs' argument that Lynn Gas and Lynn Electric (and later Mass. Electric) were separate entities for purposes of assessing liability for negligence and Plaintiffs' subsequent argument that NEES's domination of all three entities was pervasive enough to justify piercing the corporate veil and holding NEES directly responsible for the acts of its subsidiaries. Nevertheless, the test for determining responsibility for sale of property under the common law differs from the test for determining responsibility for disposal of hazardous waste under CERCLA and the Massachusetts Hazardous Waste Act, *see* Part III, *infra*. Therefore, it is conceivable that, under these different tests, different entities would qualify as owners for purposes of negligence than would for purposes of liability under the hazardous waste disposal statutes. Accordingly, at this stage in the litigation, this court merely notes the apparent inconsistency.

**9.** Count VI (Negligence) also runs against Eastern as the corporate parent of Boston Gas. For the reasons discussed below, *see infra* Part IV, the Second Amended Complaint fails to allege a basis for piercing the corporate veil and holding Eastern liable for the acts of its subsidiary. Eastern's Motion to Dismiss Count VI is, therefore, ALLOWED.

tain a negligence action against Mass. Electric for damage to those parcels of land. Nevertheless, Plaintiffs argue that,

> [although] this is not stated explicitly in the Amended Complaint, Mass. Electric, as an owner of properties adjacent to Lot 3, is liable to Boyd for its negligence in failing to detect any hazardous waste on its property and the migration of that waste and in failing either to stop the migration of the hazardous waste on to Lot 3 or to remove the waste. These allegations can be fully inferred from the allegations of the Amended Complaint.

Plaintiffs' Memorandum in Opposition to Motion to Dismiss at 30.

Despite their sweeping statement, Plaintiffs identify no allegations that support this inference. Indeed, a careful reading of the entire complaint, with particular attention to the allegations concerning Mass. Electric and to the negligence count, reveals nothing that would even suggest such a theory. The only relevant allegation of negligence, Paragraph 30 of the Second Amended Complaint, charges merely that *"the Plant's owners and operators* engaged in activity which caused, and continues to cause, the release and disposal of hazardous waste material [onto Plaintiffs' properties]" (emphasis added). As Mass. Electric never owned or operated the Plant, this allegation excludes Mass. Electric by its own terms.[10]

Similarly, Paragraph 77 states simply, "The Defendants had an obligation to the public, including to the Plaintiffs, to operate the Plant in a safe manner and to avoid contaminating adjacent land and groundwa-

ter with the Plant's hazardous wastes and residues." Even viewed in the light most favorable to plaintiffs, *see The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 20 (1st Cir.1989), this allegation does no more than assert that Defendants operated the Plant negligently and failed to prevent hazardous materials from contaminating lots adjacent to the Plant. In short, there is not even a hint of Plaintiffs' counterintuitive theory, advanced only in their motion papers, that hazardous wastes from the adjacent Lots migrated back onto the Plant site, Lot 3, and contaminated it.

Accordingly, Plaintiffs have failed to state a cause of action in negligence against Mass. Electric, and Mass. Electric's motion to dismiss Count VI (Negligence), is, therefore, ALLOWED.

### III

#### *M.G.L. c. 93A*

■ Defendants Boston Gas and Mass. Electric have also moved to dismiss the Chapter 93A counts against them on the grounds that they lacked any business relationship[11] with Plaintiffs.[12] Boston Gas and Mass. Electric stress that they had no dealings, direct or indirect, with Plaintiffs concerning their acquisition of the Lots. Rather, Plaintiffs negotiated and purchased directly from EDIC. Nonetheless, Plaintiffs contend that liability under Chapter 93A extends to all foreseeable future purchasers.

M.G.L. c. 93A § 11 provides a cause of action for

---

**10.** Although Mass. Electric never owned or operated the Plant, Plaintiffs may nevertheless have a cognizable claim of successor liability against Mass. Electric for the acts of Lynn G & E during the period when Lynn G & E owned and operated the plant. Despite this possibility, Lynn G & E owned all the Lots at that time, and, as this court recognized above, *see supra* at 437–38, under the *Wellesley Hills* doctrine, plaintiffs cannot assert a claim for any damage to the land caused by Lynn G & E's negligence during that period.

**11.** Defendants characterize their argument as an assertion that Plaintiffs lack standing. In fact, Defendants' claim that Chapter 93A does not

regulate conduct in the absence of a business relationship is a substantive argument. *Cf. City of Boston v. Aetna Life*, 399 Mass. 569, 575, 506 N.E.2d 106, 110 (1987) ("If there is a standing requirement involved in § 11, it is that the plaintiff must be a 'person who engages in the conduct of any trade or commerce.' ").

**12.** Boston Gas and Mass. Electric also argue that their transfer of properties to EDIC pursuant to EDIC's eminent domain power did not involve "trade or commerce" within the meaning of the statute. Because Defendants prevail on their first argument, this court does not address the novel issue of state law which this alternative argument presents.

[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive practice....

In general, Massachusetts courts have construed this language liberally. The Massachusetts Supreme Judicial Court has held that Section 11 does not require privity of contract. *Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 324, 446 N.E.2d 681, 683 (Mass.1983). Another judge in this district has extended the coverage of Section 11 to intended third party beneficiaries. *See Chestnut Hill Development Corp. v. Otis Elevator Co.*, 653 F.Supp. 927, 933 (D.Mass.1987) (Caffrey, S.D.J.).

The Supreme Judicial Court has yet to rule, however, on the question of whether liability extends to subsequent purchasers who are merely foreseeable. Rather, the Supreme Judicial Court has stressed the existence of some contractual or business relationship between the parties as a precursor to liability under Chapter 93A. In particular, the Supreme Judicial Court declined to impose Chapter 93A liability on a surveyor, retained by a seller, for the surveyor's failure to disclose a material fact to a prospective purchaser. *See Nei* 446 N.E.2d at 683–84. Similarly, Judge Caffrey recognized the business relationship requirement in *Chestnut Hill* when he extended Chapter 93A protection to an owner-developer, as the third party beneficiary of an agreement between a general contractor and a subcontractor. Of critical significance there was the fact that all three parties actively participated in negotiations over the subcontract. *See Chestnut Hill* at 933.

Taken together, these cases demonstrate that, although the Supreme Judicial Court has yet to define the outer limits of the relationship required under Chapter 93A, some business connection between the parties is an essential element of liability under the statute. Here, no such relationship exists, not even one analogous to the attenuated connection between surveyor and prospective purchaser that the Supreme Judicial Court found inadequate in *Nei*. Plaintiffs' proposed foreseeability test would extend liability indefinitely and, in so doing, would eviscerate the business relationship requirement.[13]

This court, therefore, concludes that Plaintiffs have failed to state a cause of action under M.G.L. c. 93A against either Boston Gas or Mass. Electric. Accordingly, their motions to dismiss Counts III and IV are hereby ALLOWED.

## IV

### *CERCLA and the Massachusetts Hazardous Waste Act* [14]

Eastern has moved to dismiss the CERCLA and Massachusetts Hazardous Waste Act counts against it on the grounds that it was never an owner or operator of the Plant.[15] In response, Plaintiffs argue that

---

**13.** This court also notes that the imposition of a business relationship requirement does not deprive Plaintiffs of a remedy. Here, not only do Plaintiffs have recourse to federal and state hazardous waste laws, but Plaintiffs have also alleged a Chapter 93A claim directly against EDIC, the entity which sold Plaintiffs the properties.

**14.** Although the discussion that follows speaks almost exclusively in terms of liability under CERCLA, the Massachusetts Hazardous Waste Act is patterned after CERCLA, *see Dedham Water Co. v. Cumberland Farms Dairy*, 889 F.2d 1146, 1156–57 (1st Cir.1989), and, given the similarity between the two statutes, *see infra*, n. 15, this court believes that, for purposes of the motions to dismiss in this case, the analysis of liability under the two statutes is the same.

**15.** CERCLA imposes liability on, *inter alia,* "(1) the owner and operator of ... a facility [and] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a). The Massachusetts Hazardous Waste Act similarly imposes liability on, *inter alia,* "the owner or operator of a vessel or site from or at which there is or has been a release or threat of release of oil or hazardous material [and] (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material." M.G.L. c. 21E § 5. Both the Federal and Massachusetts stat-

Eastern's involvement, as corporate parent of Lynn Gas for one day in 1973, is sufficient for the imposition of liability under these broad, remedial statutes.

Neither CERCLA nor the Massachusetts Hazardous Waste Act explicitly address the question of the liability of a parent corporation for the acts of its subsidiary. The First Circuit has recently declared that a parent corporation may be liable as an operator under CERCLA. *United States v. Kayser–Roth Corp., Inc.*, 910 F.2d 24, 26–27 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). In that opinion, the court noted

> that it is obviously not the usual case that the parent of a wholly owned subsidiary is the operator of the subsidiary. To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary.

*Id.* at 27.

■ Here, Plaintiffs' Second Amended Complaint does not even allege this minimum, but only charges Eastern with voting its shares to approve a sale of Lynn Gas's assets. A single such corporate act, unconnected in any way to decisions about the operations of the facility in question, cannot suffice to demonstrate "the pervasive control necessary to prove operator status." *Id.* at 27.

Although Eastern may not be charged as an operator, the question remains whether its status as a corporate parent could subject it to liability as an "owner." The First Circuit has yet to consider the circumstances which would justify piercing the veil of a corporate subsidiary in order to hold its parent liable as an owner under CERCLA. *See id.* at 28 n. 11. Nevertheless, in other contexts, the First Circuit has remarked,

The general rule adopted in the federal cases is that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.' In applying this rule, federal courts will look closely to the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine....

*Alman v. Danin,* 801 F.2d 1, 3 (1st Cir. 1986) (quoting *Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981)) (citations omitted).

■ CERCLA's meager legislative history, *see* H.R. No. 96–1016(II), 96th Cong.2d Sess. 17 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, does not provide much guidance for this inquiry. The First Circuit, however, has identified two essential purposes of the statute.

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982)). These statutory goals indicate that the corporate form alone will not shield entities that exhibit significant indicia of responsibility from CERCLA liability.

But, CERCLA does not make the corporate form irrelevant. Although one commentator has argued that the traditional justifications for limited corporate liability do not apply to parent corporations in the

---

utes define "owner or operator" as, "in the case of a [site], any person owning or operating such site, and ... in the case of [an abandoned site], any person who owned, operated, or otherwise controlled activities at such [site] immediately [prior to such abandonment]. The term shall

not include a person, who, without participating in the management of a ... [site] holds indicia of ownership primarily to protect his security interest in ... [the site]." 42 U.S.C. § 9601(20)(A); M.G.L. c. 21E § 2.

context of hazardous waste disposal sites, *see* Note, *Parent Corporation Liability,* 99 Harv.L.Rev. 986 (1986), this court agrees with Judge Young's observation that limited liability may serve a useful purpose in allowing corporations to put waste sites to productive uses by creating well capitalized, non-fraudulent, separate corporate subsidiaries that pose a defined economic risk to their parent.[16] *In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. 22, 32 (D.Mass. 1987). Indeed, the potentially ruinous liability that CERCLA imposes on a responsible entity suggests a particularly compelling need for the protection of corporate status. Without the limits on liability that corporate status provides, even the largest corporation might pause before embarking on an investment involving a waste site. *See generally* Feder, *In the Clutches of the Superfund Mess,* N.Y. Times, June 16, 1991, § 3, at 1, col. 2 (analyzing effects on businesses of large damage awards and astronomical litigation costs in CERCLA actions).

■ Notwithstanding the noble social purposes embodied in CERCLA, there is nothing peculiar to the problem of hazardous waste disposal that, in the absence of Congressional direction, would justify a policy that would ignore the corporate form altogether in these types of cases. *See Acushnet,* 675 F.Supp. at 32. *See also Joslyn Mfg. Co. v. T.L. James & Co., Inc.,* 893 F.2d 80, 82–83 (5th Cir.1990) (refusing to read definition of "owner or operator" liberally and broadly to reach parent corporations whose subsidiaries are found liable under CERCLA). But, while CERCLA does not require wholesale abandonment of conventional principles for determining corporate liability, "[t]he policies underlying the statute in question can direct the emphasis the court will place on the various

factors examined in deciding whether to pierce the corporate veil." *Acushnet,* 675 F.Supp. at 33. In CERCLA actions, evidence of pervasive parental control over hazardous waste disposal policies assumes particular importance in a decision to pierce the corporate veil. *Id.* at 33–34. *See also* Note, *The Potentially Responsible Trustee: Probable Target for CERCLA Liability,* 77 Va.L.Rev. 113, 136 (reviewing CERCLA cases imposing liability on corporate officers and concluding that officers may be held liable when they own the corporation and actively participate in, and have authority over, the handling of hazardous materials).

At least two other district courts in this circuit have imposed CERCLA liability on corporate owners who exercised pervasive control over *all* aspects of their businesses. In *United States v. Mottolo,* 695 F.Supp. 615 (D.N.H.1988), the court imposed liability on a defendant who admitted that he incorporated to avoid personal liability. After incorporation, the defendant remained as general manager, and he and his wife remained the sole owners of the business. The incorporation did not result in any changes in operations or personnel. *Id.* at 624. On these facts, the court held that, in spite of corporate formalities, the defendant was in fact the owner of a facility within the meaning of CERCLA and imposed corresponding liability. *Id.* at 624–25. *See also New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985) (imposing personal liability under CERCLA on owning stockholder who managed the corporation). Similarly, the district court in *United States v. Kayser–Roth,* 724 F.Supp. 15, 24 (D.R.I.1989), imposed ownership liability on a corporate parent that exhibited "overwhelming pervasive control" over its subsidiary.[17]

---

**16.** Judge Young rejected the extreme view, advocated by the United States and the Commonwealth of Massachusetts, that a parent corporation should face ownership liability whenever a parent corporation has entered into anything beyond a "pure investment relationship" with a subsidiary. *In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. 22, 30–34 (D.Mass.1987).

**17.** Because it found the corporate parent liable as an operator of a facility, the First Circuit did not address the additional ownership holding of the district court. *See Kayser–Roth,* 910 F.2d at 28 n. 11.

Turning now to Plaintiffs' allegations in the Second Amended Complaint, it is clear that Eastern never exercised any financial or operational control over the affairs of Lynn Gas, let alone the sort of pervasive control over hazardous waste policies or operations that would make the attribution of ownership liability equitable under CERCLA. *Cf. Kayser–Roth*, 724 F.Supp. at 24 (citing overwhelming financial and operational control by parent as justification for piercing corporate veil). In fact, the complaint alleges that Eastern's "control" consisted only of exercising its shareholder rights to vote to liquidate the corporation and to sell all its assets. Yet shareholder participation in such basic decisions is entirely consistent with traditional corporate organization. *See Acushnet*, 675 F.Supp. at 34 ("shareholder control of significant expenditures is not a disregard of corporate separateness"). *Cf.* M.G.L. c. 155 § 50 ("A corporation which desires to close its affairs may ... by a vote of a majority of all its stock ... authorize a petition for its dissolution ...."). The exercise of the statutorily contemplated power of dissolution, therefore, does not by itself justify piercing the veil.

Accordingly, the Second Amended Complaint fails to allege a basis for imposing ownership liability on Eastern, and Eastern's motion to dismiss Counts I and II is, therefore, ALLOWED.

## V

### *Conclusion*

In summary, Boston Gas's and NEES's motions to dismiss Count VI (Negligence) of the Second Amended Complaint are hereby DENIED. Eastern's and Mass. Electric's motions to dismiss Count VI are hereby ALLOWED. Boston Gas's and Mass. Electric's motions to dismiss Counts III and IV (Unfair Trade Practices) and Eastern's motion to dismiss Counts I (CERCLA) and II (Massachusetts Hazardous Waste Act) are also hereby ALLOWED. Finally, Plaintiffs' motion to correct misnomer of party is hereby ALLOWED.

### ORDER

Plaintiffs' Motion for Partial Summary Judgment is hereby DENIED.

IT IS SO ORDERED.