**L.B. CORPORATION, Plaintiff,**

**v.**

**SCHWEITZER–MAUDUIT INTERNATIONAL, INC., and Kimberly–Clark Corporation, Defendants.**

**No. Civ.A. 99–30079–MAP.**

United States District Court,
D. Massachusetts.

Nov. 22, 2000.

James C. King, Hanify & King, P.C., Boston, MA, Brian P. McDonough, Hanify & King, Boston, MA, for Plaintiff.

Thomas G. Fiore, John W. Fieldsteel, Urbelis, Fieldsteel & Bailin, LLP, James C. King, Hanify & King, P.C., Brian P. McDonough, Hanify & King, Boston, MA, for Defendants.

*MEMORANDUM REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I to VIII AND DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY* (Docket Nos. 34 and 38)

PONSOR, District Judge.

## I. INTRODUCTION

In this diversity action, plaintiff L.B. Corporation seeks compensation for damage to its real property allegedly caused by defendants Schweitzer–Mauduit Corporation, an abutting landowner, and Kimberly–Clark Corporation, the previous owner of the land. Plaintiff's ten-count complaint asserts three kinds of tortious conduct: 1) improper pumping of water from one of defendants' wells, causing the buildings on plaintiff's land to subside, 2) illegal disposal of hazardous materials in defendants' landfill, which allegedly contaminated plaintiff's well water, and 3) trespassory maintenance of an electric wire across plaintiff's property. Defendants have moved for partial summary judgment as to Counts I–VIII (the subsidence and contamination claims) and have separately moved *in limine* to exclude the testimony of plaintiff's expert, Peter Shanahan.

For reasons explained more fully below, the court will preclude plaintiff from asserting any common law claims for damage sustained to its building prior to March 19, 1996. It will allow summary judgment as to plaintiff's claims under Mass.Gen.Laws. Ch. 93A and for strict liability, and will deny defendants' motion in limine and its corresponding motion for summary judgment on the claims for contamination of plaintiff's wells.

## II. FACTS

The following facts are supported by the record as developed through discovery. They are viewed, pursuant to Fed.R.Civ.P. 56, in the light most favorable to the plaintiff.

### A. *Contamination of Plaintiff's Wells*

On November 16, 1984, plaintiff L.B. Corporation bought a fifteen-acre parcel of land in Lee, Massachusetts from defendant Kimberly–Clark Corporation called the Valley Industrial Park. Kimberly–Clark retained the abutting land to the south, which included a landfill called the Valley Mill Landfill. L.B. Corporation subsequently erected buildings on its land and leased at least one of them to a commercial tenant.

In negotiations leading up to the 1984 sale, Thomas Garrity, plaintiff's president and principal owner, expressed to Kimberly–Clark that he did not wish to buy the abutting Valley Mill Landfill because he did not want to incur any risk of liability stemming from possible environmental pollution. Plaintiff claims that despite Kimberly–Clark's knowledge of Garrity's concerns about liability, it failed to inform him that contaminants from the Valley Mill Landfill might leach into the surrounding groundwater. Prior to closing the land sale, Kimberly–Clark knew that unburned chemicals had been poured into the landfill and had been advised by the Environmental Protection Agency that the chemicals could leach into the surrounding water table. *See* Appendix to Plaintiff's Memorandum in Opposition, Docket No. 52, Ex. 2 (Smith interview, 6/28/81); Ex. 1 (EPA

Report, 8/9/83). Plaintiff produced an internal memorandum by a Kimberly–Clark employee expressing concern that "the potential hazardous waste dumped on the site" might "affect the sale price of the land." *Id.*, Ex. 3 (Letter of Philpott to Larmon dated 11/4/83). Had President Garrity known of the possibility of contamination of the Valley Industrial Park at the time of sale, he states, "L.B. Corporation's interest in the property would have been entirely different." Garrity Affidavit, Docket No. 47, ¶ 7.

In 1997, the Massachusetts Department of Environmental Protection informed plaintiff that the wells in the Valley Industrial Park were contaminated with Volatile Organic Compounds. Plaintiff consequently shut down all its wells and was forced to connect its property to the Town of Lenox water supply, at some expense. Since 1995, the abutting Valley Mill Landfill site has been controlled by Schweitzer–Mauduit, a spinoff corporation of Kimberly–Clark.

Plaintiff's expert, Peter Shanahan, plans to testify that the contamination found in plaintiff's wells came from defendants' landfill. He has submitted expert reports and affidavits supporting that view.

B. *Subsidence of Plaintiff's Buildings*

In 1992, Kimberly–Clark built a new well on its property, called Well # 5. The new well was drilled on the site of the Valley Mill Landfill, less than 100 yards from the boundary to plaintiff's property. On November 22, 1993, plaintiff's counsel informed Kimberly–Clark that the withdrawal of water from the new well had caused one of plaintiff's buildings to subside at least 12 inches. An attorney from Kimberly–Clark subsequently told plaintiff that Kimberly–Clark was investigating the claim, but plaintiff alleges that no real investigation ever took place. Discussions about the settlement of the building continued off and on until 1995, when Garrity claims he "chose to believe" the assurances of both Kimberly–Clark and Schweitzer–

Mauduit that Well # 5 was not causing the subsidence of plaintiff's building. Garrity Affidavit, Docket No. 47, ¶ 14. In late 1995 and early 1996, plaintiff made repairs to its building, including fixing the walls and foundations, and building an addition to the property that was intended, in part, to give the original structure greater support.

In the spring of 1997, however, Garrity discovered that his building had continued to settle and that the settlement had practically undone all of the previous year's repairs. Garrity again complained to Schweitzer–Mauduit, but to no avail. In 1998, the building was near collapse and plaintiff had to conduct emergency repairs to keep it standing.

Plaintiff contends that, according to Schweitzer–Mauduit's own records, between August 23, 1996, and March 17, 1997, it pumped water substantially in excess of the safe yield for Well # 5. Appendix to Plaintiff's Memorandum in Opposition, Docket No. 52, Ex. 32, p. 9927–9930. Plaintiff alleges that this over-pumping caused the dramatic settling of its property between 1996 and 1997. The settlement continues to this day, plaintiff asserts, though at a slower rate. Plaintiff also notes that Schweitzer–Mauduit conducted the increased level of pumping while Massachusetts regulatory authorities were deciding whether to approve a permit for continued pumping at Well # 5, and alleges that Schweitzer–Mauduit and Kimberly–Clark made misstatements to the authorities during that process.

### III. DISCUSSION

A. *Standard of Review.*

A court may allow a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Goldman v.*

*First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). Initially, the moving party must aver that the nonmoving party lacks evidence to support its claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). In order to avoid summary judgment, the nonmoving party carries the burden of establishing a genuine issue of material fact as to every element of its case. *See Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991). In determining whether a genuine issue exists for trial the court must view facts, and inferences from facts, in the light most favorable to the plaintiff. *Diaz v. City of Fitchburg,* 176 F.3d 560, 561 (1st Cir.1999).

### B. *Claims for Building Settlement.*

#### 1. *Statute of Limitations.*

Defendants argue that the court should bar any claims for damages to plaintiff's building sustained prior to March 19, 1996 under plaintiff's theories of negligence, strict liability, or nuisance, because the three-year statute of limitations for such claims has run.[1] Defendants contend that plaintiff both sustained and repaired significant damage to its building prior to March 19, 1996, with full notice of its claims against defendants. Damages for these repairs, they argue, are barred by the statute of limitations.

Plaintiff agrees, up to a point. However, defendants take the argument a step further. They allege that President Garrity admitted in his deposition that by 1995 he considered the building to be a total loss. Garrity had sent a letter to Schweitzer–Mauduit on August 8, 1995, asserting a claim for $400,000 from the subsidence. In deposition, Garrity explained the $400,000 figure by stating that at the time, "the way things were going ... we'd probably end up knocking the whole thing down being condemned." Appendix to De-

fendants' Memorandum in Support, Ex. 4, (Garrity Dep., Tr. 304/1–3). From this, defendants argue that the value of the building to plaintiff in 1995 was zero, so any *further* damage to a worthless building would not be recoverable at any time.

■ This aggressive view of the evidence will not withstand scrutiny. After Garrity's letter of demand, L.B. Corporation conducted significant repairs of the building, leaving it with what it claims was "the functional equivalent" of a new building by early 1996. Plaintiff's Memorandum in Opposition, Docket No. 46, at 9. After these repairs, plaintiff asserts that defendant Schweitzer–Mauduit negligently over-pumped from Well #5, causing further damage to this building, which plaintiff had to repair all over again in 1998. Whatever President Garrity's views of "the way things were going" in August, 1995, the record as viewed in the light most favorable to plaintiff contains nothing to indicate that the statute of limitations bars plaintiff's tort claims for damage sustained after March 19, 1996. *See Fabiano Shoe Co., Inc. v. Black Diamond Equip., Ltd.,* 41 F.Supp.2d 70, 72 (D.Mass.1999) (holding that plaintiffs do not lose their right to sue for damages sustained within statute of limitations period by failing to sue on earlier incidents in timely manner).

#### 2. *Chapter 93A for Subsidence.*

Defendants have moved for summary judgment on Count VII of plaintiff's Amended Complaint, which alleges that the conduct of defendants in their operation of Well #5 constituted an "unfair or deceptive" business act or practice prohibited by Mass.Gen.Laws ch. 93A §§ 2 and 11. Defendants contend that for Chapter 93A liability to attach, there must be some business relationship between the parties. Here, although both companies were "engaged in trade or commerce" under the

---

1. Plaintiff filed suit in Berkshire Superior Court on March 19, 1999; the action was later removed to this court.

statute, they were not engaged in business transactions with each other. Mass.Gen. Laws. ch. 93A § 11. The parties' only relationship, defendants contend, was as abutting landowners, so the statute is inapplicable. Defendants point to a case from this court that dismissed a similar Chapter 93A claim between abutters. *See Cash Energy Inc. v. Weiner*, 768 F.Supp. 892, 893–94 (D.Mass.1991). Plaintiff replies that Chapter 93A does not require any commercial relationship, and even if it does, that the parties have engaged in commercial transactions since 1983 that satisfy the statute.

■ On this point, defendants have the stronger argument. Chapter 93A is a consumer protection law that also encompasses business transactions. It is intended to protect against unfair and deceptive practices in trade, not unfair practices in general. Apart from claims of unfair competition, a plaintiff must allege some sort of transaction between the parties for liability to attach under sections two and eleven. *See Cash Energy*, 768 F.Supp. at 894; *see also Reisman v. KPMG Peat Marwick LLP*, 965 F.Supp. 165, 175, n. 14 (D.Mass. 1997) (noting that plaintiff and defendant must be engaged in business relationship for claim to lie under Chapter 93A § 11); *John Boyd Co. v. Boston Gas Co.*, 775 F.Supp. 435, 440 (D.Mass.1991) (noting that Supreme Judicial Court "has stressed the existence of some contractual or business relationship between the parties as a precursor to liability under Chapter 93A"); *Standard Register Co. v. Bolton–Emerson, Inc.*, 38 Mass.App.Ct. 545, 551, 649 N.E.2d 791 (1995) (holding that to maintain claim for fraud under Chapter 93A § 11, parties need not be in privity of contract so long as they are "engaged in more than a minor or insignificant business relationship.") This is the "common thread" of 93A cases. *Cash Energy*, 768 F.Supp. at 894. Plaintiff's position, if accepted, would run the danger of converting any tort claim against a business into a Chapter 93A claim, because all torts encompass "acts or

practices" that could arguably be considered "unfair." As Judge Keeton noted, this position "tests the limits of common sense." *Cash Energy*, 768 F.Supp. at 894.

Plaintiff's alternative position, that it has engaged in business transactions with defendants that satisfy Chapter 93A, also fails. In essence, plaintiff is complaining of excessive pumping from a well, not of unfair acts or practices in a commercial transaction. Accordingly, summary judgment will be allowed for Count VII because it fails to state a claim upon which relief can be granted.

3. *Strict Liability.*

■ Defendants have moved for summary judgment on Count II of plaintiff's Amended Complaint, which seeks to hold defendants strictly liable for the settlement of plaintiff's buildings. Defendants contend that Massachusetts law does not allow strict liability for subsidence of buildings from the pumping of subsurface water. Rather, negligence must be shown to recover. *See Gamer v. Milton*, 346 Mass. 617, 620–21, 195 N.E.2d 65 (1964) (holding subsidence caused by negligent removal of water to be recoverable). In response, plaintiff points to the well-established rule that a landowner who digs on his own land will be held strictly liable if he removes lateral support from the adjoining land of a plaintiff, causing damage to the land in its natural state. *See, e.g., Corcoran v. S.S. Kresge Co.*, 313 Mass. 299, 303, 47 N.E.2d 257 (1943); *Gilmore v. Driscoll*, 122 Mass. 199, 206–207 (1877). Plaintiff asserts that damage to the natural state of its land has occurred from defendants' pumping of water, so strict liability should be imposed.

■ Again, defendants' argument is more persuasive. Massachusetts has not clearly recognized strict liability for the pumping of subterranean water, even if it results in damage to a plaintiff's land in its natural state. *See Gamer*, 346 Mass. at 620–21, 195 N.E.2d 65 (negligence); *New York Cent. R. Co. v. Marinucci Bros. &*

*Co.*, 337 Mass. 469, 472, 149 N.E.2d 680 (1958) (negligence). The strict liability cases on which plaintiff relies have to do with the removal of lateral support by excavation, not by pumping. *See Marinucci Bros.*, 337 Mass. at 472, 149 N.E.2d 680 (restating rule on strict liability for excavating and holding that excavator who withdraws mixture of silt and water can be held liable for negligence); *Gilmore v. Driscoll*, 122 Mass. 199 (holding that landowner who digs in such a way as to disturb natural state of neighboring land is strictly liable). As for the pumping of subsurface water, the SJC has held that "a landowner has absolute ownership in the subsurface percolating water in his land," and if a plaintiff is to recover for harm from such use, "it must be on the basis of the negligent manner in which [the removal] was done." *Gamer*, 346 Mass. at 620–21, 195 N.E.2d 65.

Even if strict liability were a possible standard, however, plaintiff has produced no evidence that its land in its natural state has settled. It only complains of damage to its buildings, and such damages are not recoverable in strict liability. *See Marinucci Bros.*, 337 Mass. at 472, 149 N.E.2d 680. Summary judgment will therefore be allowed on Count II.

## C. Claims for Contamination.

### 1. Nondisclosure as Chapter 93A Violation.

Count VIII of plaintiff's Amended Complaint asserts a cause of action under Mass.Gen.Laws. ch. 93A §§ 2 and 11 for contamination of plaintiff's well water. The text of Count VIII specifies the pollution of the property as the sole basis for the chapter 93A violation, but plaintiff's memorandum now states that the claim also arises from Kimberly–Clark's failure to disclose, at the time of the 1984 sale, that its landfill might contaminate plaintiff's groundwater. Plaintiff has produced evidence that at the time of sale Kimberly–Clark knew that chemicals might leach into the groundwater. The record con-

tains a "preliminary assessment report" from the Environmental Protection Agency sent to Valley Mill, with a cover letter dated May 15, 1984, stating that "[t]here is a potential for leachate of unburned chemicals to leach to the high water table." Appendix to Plaintiff's Memorandum in Opposition, Docket No. 52, Ex. 1, at 2731 (EPA Report, 8/9/93). The record also contains a summary of a 1981 interview by Kimberly–Clark of Bradford Smith, a retired Kimberly–Clark employee, who stated that chemicals were poured directly into the landfill during his tenure working there. Additionally, plaintiff has produced a Kimberly–Clark interoffice memorandum dated November 4, 1983 by one J. Philpott expressing concern that the "potential hazardous waste dumped on the site" might affect the sale price of the property. Appendix to Plaintiff's Memorandum in Opposition, Docket No. 52, Ex. 3 (Philpott Memo, 11/4/93).

Plaintiff contends that Kimberly–Clark never notified it of this potential contamination during sale negotiations. Had it been notified, according to President Garrity, "L.B. Corporation's interest in the property would have been entirely different." Garrity Aff., Docket No. 47, ¶ 7. Plaintiff contends that this evidence shows that Kimberly–Clark violated chapter 93A's proscription against "unfair or deceptive acts or practices" in the conduct of trade. Mass.Gen.Laws. ch. 93A § 2.

Defendants argue that there is no evidence that plaintiff relied on Kimberly–Clark's nondisclosure to its detriment. Additionally, they point out that plaintiff's wells were not drilled until after the sale of the property, so the contamination of wells not yet in existence could not have been foreseeable to Kimberly–Clark. Defendants point to the *Urman* case, in which the SJC held that the failure to disclose the fact of contamination of neighboring schools was held not to be a violation of Chapter 93A. *See Urman v. South Boston Sav. Bank*, 424 Mass. 165, 674 N.E.2d 1078 (1997).

■ Unlike common law fraud and misrepresentation, Chapter 93A imposes liability for material nondisclosure in transactions. *See Urman,* 424 Mass. at 168, 674 N.E.2d 1078. It is a violation of the act to fail "to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 Code Mass.Regs. 3.16(2). In seeking to recover damages arising from the sale of contaminated property, a plaintiff must show that the seller knew of the contamination, that the contamination was a material circumstance that might have led the plaintiff not to purchase the property, and that the seller failed to disclose the problem. *See Urman v. South Boston Sav. Bank,* No. 9201593, 1994 WL 878815, \*4 (Mass Super. Oct 19, 1994), *aff'd,* 424 Mass. 165, 674 N.E.2d 1078 (1997). Additionally, in a § 11 claim between businesses, a plaintiff must show that the failure to disclose was marked by a level of "rascality" that would "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979).

■ The court will allow defendant's motion on this portion of. Count VIII, but not for the reasons advanced by defendant. Rather, the nondisclosure pillar of the count falls because it rests only on defendants' knowledge of the "potential" that chemicals could leach into the surrounding water table, not knowledge of actual contamination. *See* Plaintiff's Memorandum in Opposition, Docket No. 46, at 15. The Massachusetts courts have made clear that a seller's failure to disclose a potential problem, rather than an actual, known problem, does not amount to a violation of Chapter 93A. *See Underwood v. Risman,* 414 Mass. 96, 100, 605 N.E.2d 832 (1993); *Greenery Rehabilitation Group, Inc. v. Antaramian,* 36 Mass.App.Ct. 73, 78–79, 628 N.E.2d 1291 (1994). For example, in *Underwood,* plaintiff sued her landlord under chapter 93A for failing to disclose,

when asked, that her apartment contained lead-based paint. The landlord did not know the apartment contained lead-based paint, but because of his experience in real estate, his admitted awareness of the hazards of lead paint, and his knowledge that older houses such as plaintiff's were more likely to contain such paint, he could have been charged with the knowledge that its presence was likely. *See Underwood,* 414 Mass. at 100, 605 N.E.2d 832. The court held that a "suspicion or a likelihood" of a problem "rather than knowledge" could not amount to a violation of chapter 93A. *Id.* Similarly here, the record shows, at most, that defendants knew that chemicals had been dumped into the Valley Mill Landfill, and that there was some "potential" for the chemicals to leach into the surrounding water table. Plaintiff has produced no showing of actual contamination of the wells until the 1997 study, thirteen years after the sale. Thus, the asserted misconduct amounts to a failure to disclose a potential problem, not a present and actual one, and does not rise to the level of a chapter 93A violation. *See id.; see also Greenery,* 36 Mass.App.Ct. at 78–79, 628 N.E.2d 1291 (holding that seller's failure to disclose possibility that tenant corporation might go into default not actionable because was "predictive insight," and therefore was nondisclosure of opinion rather than of "fact").

Additionally, even if the nondisclosure here could be construed as an unfair or deceptive act under § 2 of chapter 93A, there is no evidence that it rises to the level of "rascality" required in transactions between businesses under § 11. *See Levings,* 8 Mass.App.Ct. at 504, 396 N.E.2d 149. This was an arms-length transaction between businesses, not a deal between a worldly-wise business and a commercial innocent. *See Spence v. Boston Edison Co.,* 390 Mass. 604, 616, 459 N.E.2d 80 (1983). Defendants' misconduct, if any, was not sufficiently egregious to justify invocation of Chapter 93A § 11. *Levings,* 8 Mass.App.Ct. at 504, 396 N.E.2d 149.

## 2. Contamination as Chapter 93A Violation.

The second prong of Count VIII asserts that defendants violated chapter 93A by causing the contamination of plaintiff's well water. Plaintiffs argue that the contamination violates chapter 93A because it also transgresses a statute meant for the protection of the public's health, chapter 21E §§ 5 and 15 (anti-dumping act). *See* 940 Code Mass.Regs. 3.16(3); *Meguid v. Atlantic Petroleum Corp.*, No. 924200E, 1994 WL 879688 (Mass.Super. Feb. 15, 1994). Defendants have moved for summary judgment on the ground, addressed in B.2., *supra,* that there was no commercial transaction between the parties relating to the contamination, and therefore no chapter 93A liability.

■ As with the Chapter 93A claim over subsidence, this claim fails for want of a transaction between the parties. *See Cash Energy,* 768 F.Supp. at 894. Plaintiff's reliance on *Meguid* is misplaced. There, the plaintiffs sued their oil delivery company under 93A for overdelivering to their tank, which the company should have known was leaking oil into the ground. *See Meguid,* No. 924200E, 1994 WL 879668, *1 (Mass.Super.1994). The Meguid plaintiffs thus had a transactional relationship with the defendant that brought the case under the purview of Chapter 93A. *See id.* Chapter 21E served only to establish that defendant violated a public health ordinance, making them liable to the party injured in the course of the transaction. *See id.* In contrast, there is no transactional relationship here, so summary judgment on this count will be allowed.

## D. Motion in Limine to Exclude Plaintiff's Expert

Defendant has moved *in limine* to exclude the expert testimony of Peter Shanahan, plaintiff's expert in hydrogeology. Shanahan will testify, if permitted, that contaminants dumped into the Valley Mill Landfill leached into the wells of the Valley Industrial Park. He is admittedly well qualified. He has also submitted lengthy expert reports based on his considerable research of the area. Defendants' motion faults Shanahan for failing to perform certain tests, and notes that some of the assumptions underlying his conclusions may be unreliable. For example, defendants contend that Shanahan's assumption regarding the depth of plaintiff's wells comes from hearsay supplied by plaintiff, and not from an actual measurement or first-hand testimony. They complain that Shanahan has not measured the amount of pumping from plaintiff's wells that would be required to draw contaminants from the landfill to the wells. They also fault the expert for not performing a soil boring test of the bedrock beneath the Valley Industrial Park. Plaintiff responds that none of these tests was necessary, and that Shanahan's methods were scientifically valid in the field of hydrogeology.

■ Defendants' motion in limine misapprehends the judge's limited gatekeeping role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It is not the function of the court to determine whether the plaintiff's expert did everything that an expert could do in coming to his conclusion, or whether every piece of information he relied upon was indisputably true and accurate. These are considerations that may influence the jury's determination as to which expert to believe at trial, but are not part of the court's threshold inquiry. Rather, it is the court's duty first to confirm that the testimony is relevant, and second, to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. The testimony is clearly relevant, so the issue for the court is the scientific validity of Shanahan's reasoning.

In analyzing groundwater flow, a hydrologist necessarily depends on inferences drawn from limited data because of his poor access to the subsurface. Defendants' challenge to plaintiff's expert mostly picks at the absence of certain measurements and information from his reports, but fails to explain why the measurements are necessary to his conclusions under applicable standards of hydrogeology. It devotes only a cursory two pages to whether his reasoning is scientifically reliable.

■ The court is satisfied that Shanahan's conclusions rest on scientifically valid methodology. His nine-page report is not speculative. It considers and eliminates other possible sources of the contamination. It refers to extensive geologic studies of the area and explains, through principles of hydrogeology, how the contaminants could travel to wells underneath plaintiff's property. *See* Appendix to Plaintiff's Memorandum in Opposition, Ex. 17 (Shanahan Reptort). Defendants have produced no evidence that the methodology lacks scientific validity, or that it fails to exhibit a level of rigor generally accepted in the field of hydrogeology. Further, defendants' argument is significantly undercut by the fact that their own expert, Evan T. Johnson, relied on essentially the same methods as plaintiff's expert to conclude that the landfill was *not* the source of the contamination—only he did so with less information. *See* Shanahan Affidavit, Docket No. 50, ¶ 11. Defendants' motion in limine and its corresponding motion for summary judgment with respect to Counts IV, V, and VI will therefore be denied.[2]

### IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be ALLOWED as to Counts III, VII, and VIII. As for Counts I and III, plaintiff will be precluded from asserting any claim for damage sustained to its building prior to

2. Defendants' motion asks the court to allow summary judgment on Count VIII if plaintiff's expert were precluded from testifying. As

March 19, 1996. Defendants' motion for summary judgment will be DENIED in all other respects, and their motion in limine will be DENIED.

noted above, the court has allowed summary judgment for Count VIII on other grounds.